**SAUDI IRON AND STEEL COMPANY (HADEED), Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Georgetown Steel Corp., et al., Defendant–Intervenors.**

**GEORGETOWN STEEL CORP., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**Saudi Iron and Steel Company (Hadeed), Defendant–Intervenor.**

**Court No. 86–03–00283.**

United States Court of International Trade.

Nov. 27, 1987.

Miller & Chevalier, Chartered, Homer E. Moyer, Jr., Joanne Thomas Asbill and Christopher C. Gould, Washington, D.C., for Saudi Iron and Steel Co.

Fried, Frank, Harris Shriver, & Jacobson, David E. Birenbaum and Alan Kashdan, Washington, D.C., for Atlantic Steel Co.

Wiley, Rein & Fielding, Charles Owen Verrill, Jr. and Robert C. Weissler, Washington, D.C., for Georgetown Steel Corp., North Star Steel Texas, Inc., and Raritan River Steel Co.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Liti-

gation Branch, Civil Div., Dept. of Justice, Elizabeth C. Seastrum, U.S. Dept. of Commerce, Mary White, Washington, D.C., for defendant.

DiCARLO, Judge:

Georgetown Steel Corporation, North Star Steel Texas, Inc., Raritan River Steel Company and Atlantic Steel Company (domestic producers) and Saudi Iron and Steel Company (Hadeed) filed actions under section 516A(a) of the Tariff Act of 1930 (Act), as amended, 19 U.S.C. §§ 1516a(a)(2)(A)(i) (II) and (B)(i) (Supp. III 1985), to contest the final affirmative countervailing duty determination and order issued by the United States Department of Commerce, International Trade Administration (Commerce) which found that carbon steel wire rod from Saudi Arabia receives countervailable bounties or grants within the meaning of section 303 of the Act, as amended, 19 U.S.C. § 1303 (1982). *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Carbon Steel Wire Rod From Saudi Arabia,* 51 Fed.Reg. 4206 (Feb. 3, 1986). The actions were consolidated. Jurisdiction is provided under 28 U.S.C. §§ 1581(c) and 2631(c) (1982). Commerce's determination is sustained in part and remanded in part.

Plaintiffs move pursuant to Rule 56.1 of the Rules of this Court for judgment on the agency record. They raise four questions: (1) whether the Saudi government provides loans from the Public Investment Fund (PIF) to a specific group of enterprises within the meaning of 19 U.S.C. § 1677(5)(B) (1982); (2) whether Commerce used a reasonable methodology to determine the countervailable benefit of a PIF loan to Hadeed; (3) whether Commerce correctly characterized Hadeed's lease/purchase of a bulk material handling system as the provision of "goods or services at preferential rates" within the meaning of 19 U.S.C. § 1677(5)(B)(ii) rather than as the "provision of ... loans ... on terms inconsistent with commercial considerations" under 19 U.S.C. § 1677(5)(B)(i); and (4) whether a transfer of the Jeddah Steel Rolling Company to Hadeed constitutes a "provision of capital ... on terms inconsist-

ent with commercial considerations" within the meaning of section 1677(5)(B)(i).

In reviewing final Commerce determinations in countervailing duty investigations, the Court is directed by Congress to hold unlawful those determinations found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1982). Under the substantial evidence standard for review of agency determinations, the Court will uphold an agency's findings if they are supported in the record by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Federal Trade Comm'n v. Indiana Fed'n of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 2014, 90 L.Ed.2d 445 (1986); *Atlantic Sugar, Ltd. v. United States,* 2 Fed.Cir. (T) 130, 136, 744 F.2d 1556, 1562 (1984). The Court "must accord substantial weight to an agency's interpretation of a statute it administers." *American Lamb Co. v. United States,* 785 F.2d 994, 1001 (Fed.Cir.1986) (citing *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450–51, 98 S.Ct. 2441, 2445 57 L.Ed.2d 337 (1978); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964)). However, "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Federal Reserve System v. Dimension Financial Corp.,* 474 U.S. 361, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986).

### 1. Whether the Saudi government provides loans from the Public Investment Fund to a specific group of enterprises.

Commerce found that "Saudi commercial banks are limited in their ability and willingness to make long-term loans," in part because Islamic law prohibits collection of interest. 51 Fed.Reg. at 4208. Commerce found that "[s]ince interest obligations on loans cannot be enforced in Saudi courts, and because the Saudi government limits the amount of funds which Saudi commercial banks can loan to any one individual or legal entity, Saudi commercial banks can-

not lend large amounts of funds over a long period of time for large scale industrial construction projects." *Id.* Commerce concluded that the only sources of long-term financing in Saudi Arabia are the PIF, the Saudi Industrial Development Fund (SIDF), and three other specialized credit institutions, but that "only the PIF and SIDF provide funding to industrial or manufacturing projects." *Id.* The Saudi government provides PIF loans "to commercially productive projects in which the Saudi government has some equity participation." *Id.*

Hadeed, the only producer in Saudi Arabia exporting carbon steel wire rod to the United States during the review period January 1 to December 31, 1984, received a PIF loan comprising 60% of its total capitalization as part of its initial investment package to construct a direct reduction plant, steelmaking plant, and rolling mill. *Id.* Hadeed is partly owned by the Saudi Basic Industries Corporation (SABIC). R. 598, 614. SABIC, in turn, was wholly-owned by the Saudi government from 1976 through early 1984 when it issued new stock and became 70% government owned and 30% privately owned. R. 83, 2042.

To determine whether the Saudi government provides PIF loans to "a specific enterprise or industry or group of enterprises or industries" within the meaning of section 1677(5)(B), Commerce reviewed all PIF lending, beginning with the first loans made in 1973. Commerce found that "despite the number of products which have received PIF financing, these loans are given predominantly to finance *projects undertaken by PETROMIN, Saudia Airlines, and SABIC,*" and that "[s]ince 1978, PIF loans have gone exclusively to these *three companies' projects.*" 51 Fed.Reg. at 4208 (emphasis added). Commerce determined, therefore, that the Saudi government provides PIF loans to a "specific group of enterprises" within the meaning of the section.

Hadeed contends Commerce's determination is "premised on an erroneous factual assumption ... that PIF loans have been made to only three companies." Brief in Support of Hadeed's Motion for Judgment on the Agency Record, at 14, 21. Hadeed claims that 24 different companies received PIF loans and that 24 companies are not a "specific group of enterprises" within the meaning of the section.

The record discloses that all PIF loans were not made directly to Saudia Airlines, SABIC or PETROMIN as the named recipients. Conf.R. 1936–38. In the final determination, Commerce determined that PIF loans were provided to finance *"projects undertaken by three specific enterprises.* While the [Public Investment] Fund may be open to investment in any project in which there is some public ownership, the loans, in fact, have been *provided only to three companies."* 51 Fed.Reg. at 4215. (emphasis added). Commerce thus determined that the Saudi government provides PIF loans "to projects undertaken by a specific group of enterprises, PETROMIN, Saudia Airlines and SABIC," 51 Fed.Reg. at 4213, based on its finding that these three companies directly or through their projects received all PIF loans since 1978 and most loans since 1973.

Hadeed asserts that the operations of separate companies named as PIF loan recipients are not "projects" of Saudia Airlines, PETROMIN, and SABIC. Hadeed claims the other operations were found to be projects of these three companies merely because the three companies are equity-holders in the companies named as PIF loan recipients for the different operations and argues that this test based on commonality of shareholders has never been used to define a specific group of enterprises.

■ The record reveals Saudia Airlines is the named recipient of the PIF loans for the "projects" in which it is involved, and the record reveals that SABIC and PETROMIN, when not the 100% owner had a 50% or more interest in the company named as the recipient for the PIF loan. Conf.R. 1936–38. (Confidentiality waived). The record also reveals that SABIC kept records referring to the operations of the named PIF loan recipients in which it had an equity interest as its "projects". Conf. R. 1631–87. Records of the Saudi govern-

ment list under the headings SABIC, PE-TROMIN and Saudia Airlines these other operations in which they were involved, indicating they are projects of these three companies. *See* Conf.R. 2015–18. The record thus contains substantial evidence to support Commerce's determination that the operations of other named recipients of PIF loans were projects of Saudia Airlines, SABIC or PETROMIN.

Hadeed asserts Commerce's determination is not in accordance with law because there is no evidence that the Saudi government "targeted" the three companies to receive PIF loans. Hadeed claims that Commerce has found a benefit bestowed upon a specific group of enterprises only where there was clear evidence of some form of selection or targeting by the foreign government. Hadeed cites *Final Affirmative Countervailing Duty Order: Fabricated Automotive Glass From Mexico,* 50 Fed.Reg. 1906, 1909 (Jan. 14, 1985), in which Commerce determined that it was unnecessary to reinvestigate a foreign debt rescheduling program since it had been found to be generally available and the petitioner "provided no evidence of government selection of participants, which is a criterion for countervailing programs that otherwise appear to be generally available."

■ Decisions of this Court require Commerce to conduct a *de facto* case by case analysis to determine whether a program provides a subsidy, or a bounty or grant, to "a specific enterprise or industry or group of enterprises or industries" within the meaning of section 1677(5)(B). *See, e.g., Alberta Pork Producers' Mktg. Bd. v. United States,* 11 CIT ——, 669 F.Supp. 445 (1987); *Can–Am Corp. v. United States,* 11 CIT ——, 664 F.Supp. 1444 (1987); *PPG Indus., Inc. v. United States,* 11 CIT ——, 662 F.Supp. 258 (1987); *Al Tech Specialty Steel Corp. v. United States,* 11 CIT ——, 661 F.Supp. 1206 (1987). Under this "specificity test," proof of the intent of the foreign government to target or select specific enterprises or industries is not a prerequisite to the countervailability of the benefit provided.

■ Commerce determined, as a matter of fact, that the Saudi government provides PIF benefits to a specific group of enterprises, based on a finding that all PIF loans since 1978 and most PIF loans since 1973 have been provided to only three companies and their projects. The Court finds Commerce reasonably applied the specificity test and holds Commerce's determination that the Saudi government provides PIF loans to a specific group of enterprises is in accordance with law.

2. **Whether Commerce used a reasonable methodology to determine the countervailable benefit of the PIF loan.**

Commerce constructed a composite benchmark using a SIDF loan and a loan from a commercial bank in Saudi Arabia to determine whether Hadeed's PIF loan is on terms "inconsistent with commercial considerations" under 19 U.S.C. § 1677(5)(B)(i). Commerce determined that SIDF loans are not provided to a specific enterprise or industry or group of enterprises or industries. 51 Fed.Reg. at 4208.

Commerce found that "[f]or projects in which domestic ownership constitutes 50 percent or more of the total equity, the maximum SIDF loan amount is 50 percent of the total project costs." *Id.* Since Hadeed's level of domestic ownership was higher than 50%, and Hadeed's PIF loan was intended to cover 60% of project costs, Commerce constructed a composite benchmark with the maximum 50% SIDF loan and a 10% commercial bank loan.

Commerce compared the composite benchmark loan to the terms of Hadeed's PIF loan and determined that Hadeed's loan was given on terms inconsistent with commercial considerations. Commerce then calculated the benefit to Haded by applying

> ... the benchmark loan terms to the total amount of PIF funds drawn down by Hadeed as of the end of the review period. Since Hadeed did not pay any service charges on the PIF loan during the review period, the net benefit to Hadeed during the review period consisted of the entire benchmark loan charges.

We divided the benchmark loan charges by the value of Hadeed's sales for the review period to arrive at an estimated net bounty or grant of 4.91 percent *ad valorem.*

*Id.*

The domestic producers say Commerce's benchmark is not in accordance with law because 19 U.S.C. § 1677(5)(B)(i) requires as a "commercial" benchmark a loan from a competitive lending environment. They acknowledge that Commerce may use a government loan to construct the commercial benchmark as long as the government loans exist in a national market in which there is free competition between commercial and noncommercial loans. They argue, however, that a concessionary SIDF loan should not have been used in constructing the benchmark since Commerce found no long-term lending in Saudi Arabia except that sponsored by the government.

Under Commerce's interpretation of section 1677(5)(B)(i), the phrase "inconsistent with commercial considerations" refers to loans inconsistent with the alternative financing available in the lending environment of the country subject to investigation. Commerce will construct a "commercial" benchmark by using loans from either commercial banks or government sources in the country under investigation, as long as the government loans are not provided or required by government action to a specific enterprise or industry or group of enterprises or industries. *See* 51 Fed.Reg. at 4213 (citing *Final Affirmative Countervailing Duty Determination; Cold–Rolled Carbon Steel Flat–Rolled Products From Korea; and Final Negative Countervailing Duty Determination; Carbon Steel Structural Shapes From Korea,* 49 Fed.Reg. 47,284 (Dec. 3, 1984); *Certain Textile Mill Products and Apparel from Columbia; Suspension of Countervailing Duty Investigations,* 50 Fed.Reg. 9863 (March 12, 1985)); *see also* Subsidies Appendix, *Cold–Rolled Carbon Steel Flat–Rolled Products From Argentina: Final Affirmative Countervailing Duty Determination and Countervailing Duty Order,* 49 Fed.Reg. 18,006, 18,016 (April 26, 1984) (in situations where the respondent

lacks actual borrowing experience equivalent to the long-term loan at issue the benchmark reflects the *national* average of commercial lending alternatives).

The statute is unclear as to whether the phrase "inconsistent with commercial considerations" means, as the domestic producers claim, preferential loans inconsistent with alternative loans available in a lending environment in which some market competition from the private sector exists or whether it could mean, as Commerce indicates, preferential loans inconsistent with alternative loans available in the lending environment of the country under investigation. The legislative history offers no clear direction as to how Congress intended this section to be interpreted.

If, as in this case, an agency's interpretation of a statute does not contravene "clearly discernible legislative intent," the Court must uphold such interpretation as long as it is "sufficiently reasonable." *Kelley v. Secretary, United States Dep't of Labor,* 812 F.2d 1378, 1380 (Fed.Cir. 1987); *American Lamb,* 785 F.2d at 1001.

The domestic producers' interpretation may be reasonable, but to sustain the agency's interpretation of an ambiguous statutory provision the Court "need not find that it is the only permissible construction that [the agency] might have adopted but only that [the agency's] understanding of this very 'complex statute' is a sufficiently rational one to preclude a court from substituting its judgment for that of [the agency]." *Young v. Community Nutrition Institute,* 476 U.S. 974, 106 S.Ct. 2360, 2365, 90 L.Ed.2d 959 (1986) (quoting *Chemical Manufacturers Ass'n v. Natural Resources Defense Council,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985)).

■ The Court finds it sufficiently reasonable for Commerce to interpret the phrase "commercial considerations" used in section 1677(5)(B)(i) as referring to alternative loans available in the lending market of the country under investigation. Although Commerce's interpretation leads to the construction of a benchmark that uses

a government loan from a long-term lending market in which no private competition exists, the interpretation is sufficiently rational to preclude this Court from substituting its judgment for that of the agency.

◼ The domestic producers claim Commerce could have used a benchmark based on a borrowing rate available in the international capital markets. The Court finds Commerce acted in accordance with law by refusing to use interest rates external to the Saudi marketplace which do not reflect a national average. It was not necessary for Commerce to resort to international lending rates as the "best information available" under 19 U.S.C. § 1677e (1982 & Supp. III 1985), since it found representative alternatives to a PIF loan within the Saudi lending market.

◼ The domestic producers contend Commerce could have used an adjusted medium-term commercial bank rate in Saudi Arabia for comparison to the long-term PIF loan, asserting that Commerce has compared short-term interest rates to long-term rates in other investigations and that Commerce can compensate for the differences between long and short-term rates. Even if true, the "failure to use a discretionary alternative method does not constitute error when the agency uses a lawful second method." *Carlisle Tire & Rubber Co. v. United States*, 9 CIT 520, 525, 622 F.Supp. 1071, 1076 (1985); *Zenith Radio Corp. v. United States*, 9 CIT 110, 113, 606 F.Supp. 695, 698 (1985), *aff'd*, 783 F.2d 184 (Fed.Cir.1986). The question is whether a combination of a SIDF loan and a medium-term commercial bank loan is a lawful method.

The domestic producers say Commerce could not use the SIDF loan to construct a composite benchmark because Hadeed could not qualify for an SIDF loan. They argue that the SIDF was designed for industries and for projects smaller than Hadeed's venture.

Although Commerce found that the SIDF was established "to provide loans to small- and medium-sized private industries," it also found that the SIDF "can make loans for up to 15 years to any li-

censed company in Saudi Arabia which is at least 25 percent domestically owned and which has some private Saudi ownership." 51 Fed.Reg. at 4208. Commerce "chose the SIDF loan because SIDF is the only Saudi specialized credit institution, other than PIF, which provides industrial loans, and we [Commerce] verified that SIDF has provided loans to hundreds of companies in a wide variety of industries." *Id.* at 4216.

◼ The record reveals Hadeed possessed the necessary qualifications for an SIDF loan, that such loans have been widely distributed, and that SIDF is the only other Saudi specialized credit institution which lends to industrial or manufacturing projects. R. 83, 87, 598, 2385–2458, 3621–22; Conf.R. 2613, 2646–47. Substantial evidence exists in the record, therefore, to support Commerce's determination that an SIDF loan "is most representative of what Hadeed would otherwise have had to pay for long-term loans in Saudi Arabia." 51 Fed.Reg. at 4208.

Hadeed contends Commerce should have used only the SIDF loan in constructing a benchmark, claiming a 10% commercial bank loan on terms comparable to the long-term PIF loan was not available from any source in Saudi Arabia during the investigatory period.

◼ Commerce decided to use a 10% medium-term commercial bank loan as available in Saudi Arabia, stating: "Since the PIF loan covered 60 percent of Hadeed's total project costs, the benchmark was constructed under the assumption that Hadeed could have financed 50 percent of its total project costs with an SIDF loan (the maximum eligibility for a company with 50 percent Saudi ownership) and the remaining ten percent of project costs with a Saudi commercial bank loan." *Id.* Hadeed obtained a medium-term commercial bank loan for 10% of the project costs as required under the PIF loan program. *See* Conf.R. 2020, 2614. Commerce did not posit a hypothetical long-term commercial loan interest rate in its benchmark, but constructed the commercial bank portion of the benchmark "based on the fees paid by

Hadeed on its medium-term commercial bank loan, including an average of the various bank fees charged to service the loan and the average 1984 commission fee." 51 Fed.Reg. at 4208. Although that 10% commercial bank loan was medium-term as opposed to long-term like the PIF loan, the Court finds it reasonable for Commerce to use it in constructing the benchmark designed to reflect what Hadeed otherwise would have had to pay in Saudi Arabia absent PIF lending.

Hadeed claims that the 10% commercial bank loan in the benchmark exaggerates the amount of benefit it received from the PIF loan. Hadeed argues that it is not necessary to include the 10% commercial bank loan in the benchmark because it had drawn down less than 50% of its costs from the 60% financing available pursuant to the PIF loan terms.

■ Commerce's benchmark is based on the express terms of the PIF loan agreement which allow Hadeed to draw down 60% of project costs. The fact that the information available to Commerce during the review period shows Hadeed had, to date, not drawn down the full 60% is not relevant to the construction of the benchmark. It is reasonable for Commerce to construct the benchmark using the express terms of the loan agreement. Commerce only countervailed the benefit Hadeed received from its PIF loan since Commerce calculated the subsidy to Hadeed using the amount of the PIF loan the available information proved Hadeed had drawn down. *See id.*

Hadeed also challenges the methodology Commerce used to measure the benefit of the PIF loan.

Commerce's usual methodology for measuring the benefit to a company receiving a preferential loan is to calculate the differences between such loan and a comparable benchmark, allocate that difference over the full term of the loan, and discount the benefit to the company for a given year to reflect the changing value of money over time. *See* Subsidies Appendix, 51 Fed.Reg. at 18,016–19. This methodology is used because loans have "a readily identifiable effect on the company over time." *Id.* at 18,019.

Commerce determined that it could not use its usual methodology in this case because "the terms of Hadeed's PIF loan . . . are not readily identifiable since Hadeed's future payments on the loan depend on future profitability." 51 Fed.Reg. at 4216. Commerce calculated the benefit to Hadeed from the PIF loan on a year-to-year basis rather than allocating the difference over the full term of the loan.

■ Hadeed argues Commerce should have adhered to its standard methodology, claiming that Commerce could have accurately estimated Hadeed's future profitability. The Court, however, finds it reasonable for Commerce not to speculate on Hadeed's uncertain future profitability. Calculation of the benefit in each year does not ignore Hadeed's potential profitability since Commerce subtracts any service charges Hadeed pays under the PIF loan agreement. In calculating the benefit during the review period no subtraction was necessary because Hadeed did not pay any service charges. *Id.* at 4208.

The Court finds the methodology Commerce used to determine the countervailable benefit of Hadeed's PIF loan reasonable and supported by substantial evidence and in accordance with law.

3. **Whether Commerce correctly characterized Hadeed's lease/purchase of a bulk material handling system as the provision of goods or services at preferential rates.**

The government of Saudi Arabia, acting through the Royal Commission of Jubail and Yanbu (Royal Commission), built two bulk ship unloaders and a conveyor belt system for Hadeed pursuant to a lease agreement. *Id.* at 4209. Under the lease agreement as amended, Hadeed must repay the equipment and construction costs, in "stepped yearly payments for twenty years" with "complete ownership transferral to the Company [Hadeed] after the costs are fully recovered by the Royal Commission." R. 1159, 1161.

Commerce found the transfer to be pursuant to a lease/purchase agreement and

determined it was "[t]he provision of goods or services at preferential rates" under section 1677(5)(B)(ii). 51 Fed.Reg. at 4209.

The domestic producers claim that Commerce should have used section 1677(5)(B)(i) to characterize the transfer of this equipment as the provision of a loan "on terms inconsistent with commercial considerations." The domestic producers argue that if Commerce would have looked to the economic substance of the transfer, rather than the form of the agreement, it would have found the arrangement to be the provision of a loan. They contend the transfer is akin to a purchase money finance transaction where a seller finances the purchase of equipment. Furthermore, they say that Hadeed's agreement is not like a standard lease/purchase agreement because "there is no lump-sum payment at the end of the financing term to pay for the residual value of the facility." Reply in Support of Domestic Producers' Motion for Judgment on the Agency Record, at 23.

In lease/purchase agreements, title generally does not pass until payment is complete. Title in the bulk material handling system would not pass to Hadeed under the terms of its agreement until the end of the twenty year period when payment is complete. R. 1161. Although there is no lump-sum payment at the end as in many lease/purchase arrangements, Hadeed's final payments are substantially higher than its earlier payments. *Id.;* Conf.R. 2189.

■ There is substantial evidence in the record to support Commerce's determination that the provision of the bulk material handling system was made pursuant to a lease/purchase agreement. As a lease/purchase agreement in form and substance, Commerce reasonably characterized this transfer as the provision of goods under section 1677(5)(B)(ii).

**4. Whether SABIC's transfer of the Jeddah Steel Rolling Company to Hadeed is a "provision of capital ... on terms inconsistent with commercial considerations" under 19 U.S.C. § 1677(5)(B)(i).**

The Jeddah Steel Rolling Company (SULB) produces steel reinforcing bars at its steel rolling mill but has no facilities for producing carbon steel wire rod. 51 Fed. Reg. at 4210. In 1982, when SABIC was wholly owned by the Saudi government, SABIC acquired all of SULB's stock and transferred it to Hadeed in return for new Hadeed stock. Commerce found:

> The stock transfer, through which SULB became a wholly-owned subsidiary of Hadeed, represented a new investment decision distinct from the decision to construct Hadeed's facilities in Jubail. Therefore, an analysis of the sale of SULB to Hadeed must be based on information available as of December 1982. One of the key indicators used in the World Bank studies of the Hadeed project was the world price of steel reinforcing bars. We examined these price levels, as reported in the *Metals Bulletin,* for the 1979–1985 period. We found that by late 1982 actual world prices had decreased significantly from their levels in 1979 and 1980, when the World Bank studies were conducted. Because of the trend in prices from 1980 through 1982, we find that a reasonable investor would not have relied on these studies for the 1982 SULB investment decision.

51 Fed.Reg. 4210.

Commerce concluded that "the declining world price levels would have made it appear doubtful in late 1982 that prices, during years in which Hadeed would be operating, would reach the level necessary to generate a sufficient rate of return on equity over the life of the project." *Id.* Commerce determined that the transfer was a "provision of capital ... on terms inconsistent with commercial considerations" within the meaning of 19 U.S.C. § 1677(5)(B)(i).

Hadeed asserts that SABIC's transfer of SULB's stock should not have been considered a "provision of capital" within the meaning of the section because it did not provide Hadeed with cash or a cash-equivalent.

■ The statute does not explain the phrase "provision of capital," nor does the

legislative history provide direction on how that phrase is to be interpreted. The statute, however, uses the term "capital" and not cash or cash-equivalents. The term "capital" can refer to "any accumulated factors of production capable of being owned." *Webster's Third New International Dictionary* 332 (1981). Commerce has treated the transfer of shares of one company to a second company, in exchange for equity ownership in the second company, as the provision of capital. *See, e.g., Final Affirmative Countervailing Duty Determinations; Certain Carbon Steel Products From Sweden*, 50 Fed.Reg. 33,-375, 33,377–78 (Aug. 19, 1985); *Final Affirmative Countervailing Duty Determination; Industrial Nitrocellulose From France*, 48 Fed.Reg. 11,971, 11,973–74 (Mar. 22, 1983). In the absence of any legislative intent to the contrary, the Court finds it sufficiently reasonable for Commerce to interpret the phrase "provision of capital" in Section 1677(5)(B)(i) as referring to transfers of shares from one company to a second company.

■ Hadeed further claims that this transfer by SABIC was only a paper transaction involving the rearrangement of assets already owned by SABIC and not a provision of capital to Hadeed. The transfer of SULB, however, resulted in Hadeed becoming sole owner of SULB's assets, which included a steel rolling mill. Although the transfer rearranged SABIC's assets, Commerce could reasonably find there to be a provision of capital to Hadeed.

Hadeed also argues the transfer was not a provision of capital because Hadeed did not benefit from acquiring SULB. While important in evaluating the amount, if any, of a countervailable benefit to Hadeed, this does not affect the question of whether SABIC's transfer of SULB to Hadeed was a provision of capital.

The Court finds it sufficiently reasonable for Commerce to determine that SABIC's transfer of SULB to Hadeed constituted a "provision of capital" within the meaning of section 1677(5)(B)(i).

Hadeed claims the determination that it was unequityworthy at the time of the transfer is not supported by the record. Where a company's stock is not traded in a market, and thus there is no market-determined stock price, Commerce usually determines that the provision of capital is "inconsistent with commercial considerations" within the meaning of section 1677(5)(B)(i) if the company is not equity worthy at the time of the investment. "[A]n investment is consistent with commercial considerations if a reasonable investor could expect a reasonable rate of return on his investment within a reasonable period of time." *British Steel Corp. v. United States*, 10 CIT ——, 632 F.Supp. 59, 61 (1986).

■ Commerce found Hadeed unequityworthy at the time of the transfer because the world price levels of steel reinforcing bar, key indicators of Hadeed's future profitability, had declined such that a reasonable investor assessing Hadeed's future operations would conclude that Hadeed could not generate a sufficient return. The record contains substantial evidence to support this finding. Conf.R. 2476, 2754–57.

Although Hadeed points to evidence in the record which might justify an investment in it despite the projected decline in steel reinforcing bar prices, Brief in Support of Hadeed's Motion for Judgment on the Agency Record at 55–58, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Electric Indus. Co. v. United States*, 3 Fed.Cir. (T) 44, 51; 750 F.2d 927, 933 (Fed.Cir.1984) (quoting *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); *Armstrong Bros. Tool Co. v. United States*, 67 CCPA 94, 95 n. 4, 626 F.2d 168, 170 n. 3 (1980)).

Hadeed contends Commerce applied the wrong standard in assessing whether the transfer of the SULB assets was "inconsistent with commercial considerations." Hadeed claims that SABIC's decision to make the transfer is a "follow-up investment" in a "start-up project" for a develop-

ing country properly evaluated by determining whether the on-going project has "lost all measure of commercial reasonableness," citing *Carbon Steel Wire Rod from Trinidad and Tobago Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 49 Fed.Reg. 480 (Jan. 4, 1984).

■ *Trinidad and Tobago* is a Commerce determination limited to its own facts. A Commerce determination discussing whether one company is equityworthy under a certain set of facts is insufficient to bind Commerce to a special standard of review for determining whether other companies are equityworthy in arguably similar circumstances. Commerce properly applied the standard in *British Steel Corp.* to determine that the transfer of assets to Hadeed was "inconsistent with commercial considerations" within the meaning of section 1677(5)(B)(i).

Hadeed finally argues that a benefit is countervailable under section 1677(5)(B)(i) only if pursuant to section 1677(5)(B) such benefit is "bestowed directly or indirectly on the manufacture, production, or export" of the product under investigation. Hadeed claims Commerce's determination to countervail SABIC's transfer of SULB is not supported by substantial evidence, arguing Commerce does not explain how assets found to be devoted exclusively to the production of steel reinforcing bar, conferred any benefit, directly or indirectly, on Hadeed's manufacture, production or export of carbon steel wire rod, the product under investigation.

Defendant points to Commerce's finding that "SULB currently obtains its billets from Hadeed," 51 Fed.Reg. at 4210, and to a SULB product brochure which states "[a]lmost all of SULB's demand on billets is supplied from Jubail by Hadeed," R. 2672, 2674. Defendant claims: "It is reasonable to assume that Hadeed, by producing *all* the billets to be used both by Hadeed (to make wire rod) and by its new acquisition, SULB (to make rebar), derived a benefit since the billets destined for Hadeed's use in making wire rod would now be cheaper to produce, because Hadeed could produce greater quantities, than if Hadeed made only those billets for use in its own wire rod production." Defendant's brief in Opposition to Plaintiffs' Motions for Judgment on the Agency Record (emphasis in original) at 68. Defendant asserts Commerce clearly articulated this "economies of scale" rationale regarding billet production "because the path of the agency's decision-making process may reasonably be discerned," citing *Ceramica Regiomontana v. United States*, 810 F.2d 1137, 1139 (Fed.Cir.1987). Defendant's Supplemental Brief at 3–14.

In *Ceramica Regiomontana,* our appellate court stated that a court may "uphold [an agency's] decision of less than ideal clarity if the agency's path [in its decision-making process] may reasonably be discerned." 810 F.2d at 1139 (quoting *Bowman Transportation v. Arkansas–Best Freight Sys.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *Colorado Interstate Gas Co. v. Federal Power Comm'n*, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945)). The Court finds, however, that the path of the agency's decision-making process in the present action is not discernible from the record.

■ The Court remands the action to Commerce for an explanation as to how acquisition of SULB benefited Hadeed's wire rod production. Commerce may support this explanation by evidence already on record or, if necessary, may collect additional information to supplement the record. The Court will review Commerce's explanation to determine if it is supported by substantial evidence on the record and is in accordance with law. If Commerce finds no benefit to Hadeed's wire rod production from acquisition of SULB, however, Commerce shall reduce the countervailing duty by the amount attributed to SULB's acquisition.

### Conclusion

Commerce's final affirmative countervailing duty determination is remanded for an explanation as to how SABIC's transfer of SULB's assets to Hadeed bestowed a benefit "directly or indirectly on the manu-

facture, production, or export" of carbon steel wire rod by Hadeed within the meaning of section 1677(5)(B). All other findings of Commerce which form the basis of the countervailing duty order on carbon steel wire rod from Saudi Arabia are sustained.

Commerce shall file the results of its remand with the Court within 45 days. Hadeed will thereafter have 15 days in which to file a brief on the remand results with the Court. Defendant and the domestic producers shall file a reply within 10 days after receipt of Hadeed's brief.

So ordered.