ROSES INC., California Floral Trade Council, and Floral Trade Council, Plaintiffs,

v.

The UNITED STATES, Defendant,

and

Anapromex, Defendant–Intervenor.

No. 84–05–00632.

United States Court of International Trade.

Sept. 16, 1991.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart and Geert De Prest, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, U.S. Dept. of Justice, Civil Div., Jeanne E. Davidson, Andrea Fekkes Dynes, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., of counsel, for defendant.

Porter, Wright, Morris & Arthur, Leslie A. Glick, Columbus, Ohio, for defendant-intervenor.

## OPINION

RESTANI, Judge:

This case is before the court on plaintiffs' motion for judgment on the agency record. Plaintiffs, representatives of United States fresh cut flower producers, contend that in its second remand determination, issued on April 1, 1991, the Department of Commerce ("Commerce") violated this court's instructions contained in the remand order and issued a final negative countervailing duty determination that is not supported by substantial evidence on the record and is contrary to law. For the reasons set forth in the following paragraphs, the court finds that Commerce's determination is supported by substantial evidence of record and is in accordance with law.

### Background

I.  The statutory framework.

For almost a century, United States tariff laws have provided for the imposition of countervailing duties in certain cases where foreign producers have received a bounty or grant, and hence an unfair competitive advantage, in the form of a subsidy from their government. *See generally Zenith Radio Corp. v. United States,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978). In theory, countervailing duties subordinate immediate consumer welfare (consumers would naturally prefer the lower prices attached to the good) to the overall health of the economy (unsubsidized domestic firms may be unable to compete with subsidized foreign firms). Under United States law, Commerce may impose countervailing duties upon imported merchandise if it determines that a foreign nation is providing, directly or indirectly, a subsidy with respect to the manufacture, production, or exportation of a class or

kind of merchandise imported, or sold for importation, into the United States.[1]

■ A central issue in countervailing duty law involves the definition of a "bounty" or "grant."[2] In the case of domestic subsidies (those not contingent on exportation of the product), the law requires that some sort of benefit be conferred upon a "specific enterprise or industry or group of enterprises or industries" before countervailing duties may be assessed. *See* 19 U.S.C. § 1677(5) (1988). It is this last requirement, that of benefit to a specific enterprise or industry or group of enterprises or industries, which has proved to be a focal point for litigation in the countervailing duty area.

Before case law forced a change, Commerce adhered to the position that benefits generally available to a wide range of enterprises or industries were not countervailable. In *Cabot Corp. v. United States*, 9 CIT 489, 620 F.Supp. 722 (1985), *appeal dismissed*, 788 F.2d 1539, 1544 (1986) (*Cabot I*), the court rejected Commerce's rule,

holding that generally available benefits might indeed constitute specific grants upon specific identifiable enterprises or industries if in fact they were bestowed in such a manner so as to benefit only specific identifiable enterprises or industries. In 1988, Congress codified the holding in *Cabot I* by way of a "Special rule" added in the Omnibus Trade and Competitiveness Act. *See* House Comm. on Ways and Means, Trade and International Economic Policy Reform Act of 1987, H.Rep. No. 40 (Part I), 100th Cong., 1st Sess. 123 (1987). *See also Roses, Inc. v. United States*, 14 CIT ——, ——, 743 F.Supp. 870, 876–77 (1990).

■ Therefore, the appropriate standard now focuses "on the *de facto* case by case effect of benefits provided to recipients rather than on the nominal availability of benefits." *Cabot Corp. v. United States*, 12 CIT 664, 674, 694 F.Supp. 949, 957 (1988) (*Cabot II*); *see also Roses*, 743 F.Supp. at 879 (citing *Saudi Iron and Steel Co. (Hadeed) v. United States*, 11 CIT 880, 884, 675 F.Supp. 1362, 1367 (1987)). Recently,

1. The underlying petition in this case was filed under section 303 et seq. of the Tariff Act of 1930, as amended, 19 U.S.C. § 1303 et seq. (1988), which provides in part as follows:

[W]henever any country ... shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country ... then upon the importation of such article or merchandise into the United States ... there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. 19 U.S.C. § 1303(a)(1) (1988). No injury determination is required under this provision in contrast to section 701 of the Tariff Act of 1930, as amended by the Trade and Tariff Act of 1984, 19 U.S.C. § 1671(a)(2).

Because of the interrelationship of section 1303 and 19 U.S.C. § 1677, *see PPG Industries, Inc. v. United States*, 928 F.2d 1568, 1570 n. 2 and accompanying text (Fed.Cir.1991); *Roses, Inc. v. United States*, 14 CIT ——, ——, 743 F.Supp. 870, 874–75 (1990), the following provision of section 1677(5) is also relevant:

The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in section 1303 of this title, and includes, but is not limited to, the following:
(i) Any export subsidy described in Annex A to the Agreement (relating to illustrative list of export subsidies).

(ii) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:
(I) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.
(II) The provision of goods or services at preferential rates.
(III) The grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry.
(IV) The assumption of any costs or expenses of manufacture, production, or distribution.

2. Congressional refusal to define the words "bounty" or "grant" leads to the conclusion that Congress intended Commerce to exercise wide latitude in making its determination on this issue. *See PPG*, 928 F.2d at 1572 (citing authority). Commerce has held the following, *inter alia*, to be subsidies: capital grants, loan guarantees, loans to uncreditworthy companies, preferential loans, and preferential financing. R. Sturm, Customs Law and Administration § 58.2 at 51 (1990).

in *PPG Industries, Inc. v. United States,* 928 F.2d 1568 (Fed.Cir.1991), the Federal Circuit sustained Commerce's conclusion that a foreign government's exchange risk program and natural gas subsidy program did not target specific companies because they were in fact used by a wide variety of industries. *Id.* at 1577–79. The court found that the existence of eligibility requirements *per se* does not suffice to denote a specific class, although the requirements, if narrowly tailored, may operate in a *de facto* manner to benefit a specific industry or group of industries. The court continued to adhere to the principle that the statute requires a case by case analysis to determine whether there has been a bestowal of benefits upon a specific class, *i.e.,* it remains paramount that a discrete class of beneficiaries exist.[3]

## II. The factual background.

On April 16, 1984, Commerce published its final negative countervailing duty determination in the investigation of *Certain Fresh Cut Flowers from Mexico,* 49 Fed. Reg. 15007 (1984).[4] In this determination, Commerce found that no benefits constituting bounties or grants were being provided to producers or exporters of fresh cut flowers in Mexico.

One of the programs found not to be countervailable was the Funds Established with Relationship to Agriculture ("FIRA").[5] The FIRA program consists of three trusts which are administered by the Bank of Mexico. These trusts provide short- and long-term financing, loan guarantees, and technical support for the producing firms. The purpose of FIRA is to develop and support Mexican agriculture, especially small agricultural producers. FIRA provides support for basic foods, fishing and forestry industries, producers of agricultural tools, feed, and a variety of processed and canned products. One exporter of fresh cut flowers, Florex, received a FIRA loan during the period of the investigation.

In its final determination, Commerce found that during the period of investigation FIRA did not confer an export bounty or grant because it did not operate, and was not intended, to stimulate export over domestic sales. FIRA financing was not offered contingent upon export performance and, in fact, was given primarily to non-exporting producers. Commerce's determination of no domestic subsidy was based on its finding that FIRA loans were not targeted to any specific enterprise or industry, or group of enterprises or indus-

**3.** The appellate court in *PPG* was not in accord over the proper specificity test to be applied by Commerce and there is some question as to the extent of the controlling effect of the single-judge opinion. *See PPG,* 928 F.2d at 1580 (Michel, J., dissenting). Writing for the majority, but in an opinion not joined in by any other member of the panel, Chief Judge Nies stated that the proper test is twofold. First, if the domestic subsidy is, by its terms, given to a particular enterprise or industry, it is automatically countervailable. Second, if by its terms the benefit appears to be nominally generally available to all industries, the benefit is countervailable if, in its application, the program results in a subsidy to a specific enterprise or industry. Various factors are considered in applying this test including: (1) the extent to which a foreign government acts to limit the availability of a program; (2) the number of enterprises or industries which actually use a program; and (3) the extent of government discretion over the availability of the program. *Id.* at 1576.

In his dissent, Judge Michel stated that the proper post-*Cabot* inquiry involves two different

steps. First, the benefits must be specific, quantifiable, and traceable to specific identifiable entities or a specific class. Second, the subsidy must amount to an additional benefit or competitive advantage. *Id.* at 1581.

In spite of the difference in description of the proper test, both the majority and the dissent in *PPG* voice support for *Cabot I* and the *de facto* analysis necessary to determine whether there has been a bestowal upon a specific class, an approach which this court has followed consistently. Furthermore, if the test set forth by Chief Judge Nies is controlling and if it differs from the one set forth in the remand order issued in this action, such a test is not more advantageous to plaintiffs. Thus, no remand is necessary for application of a test different from that ordered previously in this matter.

**4.** In *Roses,* 743 F.Supp. at 871–73, this court set forth in detail the events leading up to Commerce's final negative determination.

**5.** The FIRA program is described in this court's previous opinion. *See Roses,* 743 F.Supp. at 872–73.

tries. This finding was based on Commerce's conclusion that agriculture was more than a specific industry or group of industries and the FIRA program was generally available to, and used by, wide-ranging and diverse industries.

Following plaintiffs' judicial challenge to this final determination, this court issued an opinion, *Roses*, 743 F.Supp. 870, remanding the case to Commerce for further consideration as to the domestic subsidy determination. *Id.* at 881. In accordance with this court's opinions in *PPG* and subsequent cases, the court stated that the appropriate test should have been "whether a competitive advantage *in fact* was bestowed on a specific enterprise or industry, or a group thereof, by the program at issue." *Id.* at 879. The court specifically ordered Commerce to perform further investigation and to "focus on whether an advantage in international commerce has been bestowed on a discrete class of grantees despite nominal availability, program grouping, or the absolute number of grantee companies or 'industries.'" *Id.* at 881.

Accordingly, Commerce re-evaluated its determination and issued its initial remand results on October 1, 1990. Commerce concluded that "[b]oth *de jure* and *de facto* analyses lead to the conclusion that the FIRA program did not provide a subsidy, or a bounty or grant, to a specific enterprise or industry, or group of enterprises or industries." Remand Document ("Remand Doc.") 4 at 6.[6] Finding that the FIRA program had a single set of policy objectives and maintained a unitary administrative structure, Commerce reiterated its earlier conclusion that the program was designed to foster the development of agriculture in general. Remand Doc. 4 at 13. Accordingly, Commerce affirmed its earlier determination.

On October 26, 1990, this court held a hearing to discuss the results of the remand determination. At the hearing the court stressed that the actual effects of the program must be assessed. The court stated that Commerce does not perform a proper *de facto* analysis if it merely looks at the number of companies that receive benefits under the program; the discretionary aspects of the program must be considered from the outset. *See* Transcript of October 26, 1990 Hearing at 20, 32–33.

Following the hearing, the court issued an order, *Roses, Inc. v. United States*, No. 84–05–00632, (CIT Oct. 26, 1990) ("remand order"), in which it directed Commerce to reexamine the issue of countervailability anew. The court again stated that countervailability must be assessed despite nominal availability of benefits under the program, program grouping, or the absolute number of grantees under the program. Specifically, the court instructed Commerce to "examine the levels of discretion employed in bestowing benefits both within the horticulture section and in comparison with other FIRA units," and "examine the policies behind loans both within the horticultural section and in comparison with other FIRA units." *Id.* Commerce should, the court stated, focus on determining whether a discrete class of grantees is subsidized. The court explained that although FIRA's general objectives may be uniform and its administration centralized, it might still operate to benefit discrete classes of grantees because of varying policies and broad discretionary authority.

In order to re-evaluate the issue of countervailability, Commerce sent a lengthy questionnaire to the Government of Mexico in which it requested additional information on the FIRA program, the amount of discretion involved in administering the funds, and other relevant information. On December 27, 1990, the Government of Mexico submitted answers to the questionnaire. Commerce sent a supplemental questionnaire, to which the Government of Mexico responded.

On February 8, 1991, Commerce issued a draft of its remand results and provided for submission of comments. After reviewing the comments of the various par-

---

**6.** The "Remand Documents" are those filed with the Clerk of this Court to accompany the second remand determination.

ties, Commerce verified the questionnaire responses and then again requested comments from all interested parties.

On April 1, 1991, Commerce issued its second remand determination. Once again Commerce concluded that the FIRA program was not countervailable. Remand Doc. 28 at 15–16. This time, however, Commerce carefully analyzed the policy behind the loans given to Florex and other FIRA beneficiaries and the level of discretion employed in approving a FIRA loan application. Commerce found that the record indicated that no section on ornamental horticulture ever existed, and therefore, Commerce focused its inquiry on FIRA's general loan policies and the level of discretion in the loan process generally. Commerce concluded that there was no policy of specifically assisting flower growers and that the levels of discretion employed during the application process for a FIRA loan depended primarily upon the amount of the loan. The FIRA program, in fact, was found not to target flower growers specifically, and therefore, was not found countervailable as a domestic subsidy.

## Discussion

Plaintiffs appeal Commerce's second remand determination arguing: (1) Commerce disobeyed this court's instructions by failing to inquire about the competitive advantage derived from the benefit; (2) Commerce's determination that flower growers were not a discrete class of grantees was unsupported by substantial evidence and contrary to law; and (3) Commerce erroneously assumed that agriculture was not a discrete class. Each of these arguments will be discussed in turn.[7]

I. Commerce followed this court's instructions.

Plaintiffs argue that this court's opinion in *Roses,* and the remand order following

Commerce's first remand determination directed Commerce to determine whether an advantage had been bestowed, and did not permit Commerce to limit its inquiry to the issue of whether a discrete class of recipients existed. In other words, plaintiffs argue for an analysis of the benefit conferred (a comparison of the cost of FIRA financing with the cost of commercial financing) and an analysis of the competitive advantage received.

▉ In support, plaintiffs cite to the second remand determination wherein Commerce stated: "Given that the Department has determined that the FIRA program is not countervailable, the Department does not reach the issue regarding the selection of the proper commercial benchmark."[8] Remand Doc. 28 at 18. The issue of the amount of benefit received is *not* the same as the issue of whether the Mexican flower industry received industry-specific benefits (the *de facto* test). In making a countervailing duty determination, Commerce must inquire as to the benefits received by the enterprise or industry alleged to be the discrete class. Having found that Florex obtained a FIRA loan during the period of investigation, Commerce was obligated to address the issue of whether this benefit was in fact bestowed on a discrete class. Commerce made this determination.

On the other hand, determination of the benchmark issue would enable Commerce, if there were a countervailable subsidy, to calculate the exact amount of the benefit received by each grantee. To force Commerce to calculate this amount if the program at issue is non-countervailable would impose a needless expense and waste the agency's time. Commerce did not violate the court's order by deferring the benchmark issue.

Plaintiffs also contend that Commerce was required in its countervailability determination to inquire into the competitive ad-

---

7. Plaintiffs presented oral argument after the second remand to the effect that the one FIRA loan to a flower growing company benefitted a specific *enterprise* (Florex). FIRA loans are made to numerous, diverse enterprises. In any case, this argument was not pursued throughout the various stages of this case, and is deemed abandoned.

8. The "benchmark" is the commercial rate which is compared with the FIRA rate in order to determine the amount of the benefit.

vantage derived from the benefit, *i.e.,* the effect upon international commerce of any FIRA benefit. While this is a general concern and information on this issue may assist Commerce in its determination, it does not provide a useful bright-line test. The problem with plaintiffs' contention is that United States trade laws are not aimed at protecting United States industry from *every* competitive advantage afforded by governmental action. *See Roses,* 743 F.Supp. at 876. Furthermore, precise assessment of whether there is a competitive advantage may be extremely difficult in a particular case.

The court's remand order required a finding as to specificity. Commerce complied with the order.

## II. Commerce's determination that Mexican flower growers are not a discrete class of FIRA beneficiaries is supported by substantial evidence on the record.

█ In this court's remand order, the court directed Commerce to examine both general FIRA policies and those of the "FIRA horticulture section." In the second remand determination, however, Commerce found that no "Section for Ornamental Horticulture" existed. Remand Doc. 28 at n. 6 and accompanying text. Commerce, therefore, responded to this court's instructions by analyzing the general level of discretion employed in the approval process of FIRA loans and examining the loan policies overall. If Commerce's factual finding of the nonexistence of the horticulture section is supported by substantial evidence, its methodology is also acceptable. Plaintiffs, however, dispute the finding that no specific horticulture section existed, and contend further that the Government of Mexico did target flower growers as a discrete class of beneficiaries.

Apart from its importance to choice of methodology, the nonexistence of a horticulture section, while not necessarily determinative, would be some evidence that loans through the FIRA program were not provided specifically to flower growers as a domestic subsidy by the Government of Mexico. The evidence on this issue is ambiguous. A 1981 FIRA bulletin suggested that a horticulture section was created on March 28, 1977, and reported that the section was an important part of the Division of Agriculture.[9] The Government of Mexico explained that creation of the section was only a project and "does not mean it was carried out by FIRA." *See* Remand Doc. 8 at 4. The Government of Mexico also claimed that no product-specific sections existed within FIRA. Commerce requested further information regarding this matter and was informed that for a section to have been created, FIRA's "Technical Committees" must have approved its creation and this approval did not take place. Remand Doc. 15 at 9. Accordingly, the Government of Mexico responded, "FIRA never had the cited department." *Id.*

Commerce based its finding that such a section did not exist on both the responses of the Government of Mexico and its examination of the FIRA organizational charts (charts that were regularly maintained and used internally by the FIRA administration). It is entirely possible that the 1981 bulletin mentioned a section on ornamental horticulture in more of an aspirational sense, merely assuming that such a section would be created. It is also possible that such a section was created, but never functioned because it was not approved by the FIRA Technical Committees as required. The answer of the Government of Mexico is not clearly at odds with the other information of record. Accordingly, there is substantial record evidence for Commerce's finding that no horticulture section exists.

As indicated, even without the existence of a separate section, the FIRA program could function in a way that would specifically benefit the flower industry. Accord-

---

**9.** The FIRA program consists of three trusts, all served by a single general administrative structure. A Director General heads the structure; under the Director General is a group of "subdirections." Within each subdirection are divisions. The Agricultural Division falls under the Projects and Assistance Evaluation Technical Subdirection. If a horticulture section existed, it would be within the Agricultural Division.

ingly, Commerce analyzed the policies behind FIRA loans and the levels of discretion employed in actually bestowing benefits, that is, granting loans. First, Commerce noted that the overall purpose of FIRA is to assist any producer involved in the production of agricultural, forestry, or fishery goods. Commerce verified that essentially the same criteria were used to evaluate all loan applications; the primary criterion was the possibility that the project will be a commercial success. Second, Commerce found that the level of FIRA participation in the evaluation of a loan application depended upon the amount of the loan. Nonetheless, basic evaluation was a commercial bank function and even on the larger loans FIRA performed an approval function, not a basis analysis function. Thus, Commerce concluded there is only a remote possibility that FIRA officials could exercise discretion in such a way as to benefit a specific class such as flower growers.

Commerce obtained no evidence that the FIRA program functioned in such a way that one might conclude it was simply an administrative grouping of a number of specific programs. Rather, FIRA appears to be an overall program with limited discretion available for government decision-making as to the program's application. Thus, the court finds substantial evidence to support Commerce's finding that the FIRA program did not benefit the flower industry as a discrete class of grantees.

III. Commerce correctly assumed that agriculture and the related agricultural activities did not constitute an "industry" or "group of industries."

▮ Although plaintiffs raised the issue of whether a program available to all of agriculture [10] that actually bestowed benefits, without impermissible variation, on numerous types of agricultural enterprises was countervailable, this was not the focus of the hearing prior to the second remand

and was not the specific subject of either remand order. Rather than addressing the issue of whether this argument was abandoned because it was not addressed specifically by plaintiffs after receipt of the proposed second remand decision or whether the issue was resolved in defendant's favor prior to remand, the court will address it now.[11]

Plaintiffs claim that even if FIRA operated more or less uniformly to benefit all of Mexican agriculture, an affirmative countervailing determination must result because such a program is sufficiently specific. Defendant claims that Commerce has consistently held that agriculture is not an industry or group of industries, but is a sector of the economy. Thus, according to defendant, if a program's specificity is as broad as the agricultural sector, the program is not countervailable. *See e.g. Final Negative Countervailing Duty Determination; Fresh Asparagus From Mexico,* 48 Fed.Reg. 21618, 21621 (1983) ("we consider the agricultural sector to constitute more than a single group of industries within the meaning of the Act"). Commerce has stated its position as follows: "[a] program that is limited to the agricultural sector does not necessarily result in a finding of specificity. (citations omitted) However, an agricultural program may be deemed specific if, for example, benefits under the program are limited to, or provided disproportionately to, producers of particular agricultural products." Countervailing Duties; Notice of Proposed Rulemaking, 54 Fed.Reg. 23366, 23368 (1989).

Plaintiffs claim Commerce has acted inconsistently in this regard. They cite the countervailability of benefits directed to the fishing or forestry industry. *See Final Affirmative Countervailing Duty Determination; Certain Fresh Atlantic Groundfish From Canada,* 51 Fed.Reg. 10041 (1986); *Final Negative Countervailing Duty Determinations; Certain Soft-*

---

**10.** *See* Plaintiff Roses, Inc. Brief in Support of Motion for Judgment on Agency Record, dated March 29, 1985, at 29–36; Remand Doc. 2 at 2.

**11.** The parties appear to agree that whether agriculture and related enterprises constitute an "industry" is a legal issue.

*wood Products From Canada,* 48 Fed. Reg. 24159 (1983). These decisions, however, are not instructive. Fishing and forestry are more product-specific than agriculture as a whole. Fishing and forestry constitute only a part of FIRA's "agricultural" coverage. They do not define "agriculture."

Plaintiffs also argue that since subsidies provided on a regional basis have been found countervailable, by analogy a program benefitting all of agriculture should be countervailable. Subsidies which benefit a specific geographic region have been found to be countervailable by both Commerce and this court. *See e.g. Final Affirmative Countervailing Duty Determination: Fresh, Chilled, and Frozen Pork from Canada,* 54 Fed.Reg. 30774, 30780 (1989) (under "Ontario Farm Tax Rebate Program," Ontario residents may receive rebates for owning and paying taxes on eligible farm property; program found to be "limited to enterprises or industries located in a specific region within the province" and thus, countervailable); *see also Hercules, Inc., v. United States,* 11 CIT 710, 735, 673 F.Supp. 454, 476 (1987) ("It is clear from the case law, the term 'subsidy' has been interpreted to include regional preference programs as countervailable subsidies."). In cases involving region-specific subsidies there is an industry grouping of a totally different nature than that at issue here. The focused nature of a benefit bestowed upon a specific geographical region renders it too different from a benefit offered to all of the agricultural sector to provide a useful analogy. Moreover, as the court has emphasized in the past, it is not the sheer number of the enterprises receiving benefits that dictates

whether or not a program is countervailable.[12]

Commerce's determination that a group composed of all of agriculture, that is, whatever is not services or manufacturing, is not within the meaning of the statutory words "industry or group of industries" is a reasonable interpretation of the statute. While there is room for debate on the meaning of the statutory words, Commerce's interpretation is within the realm of acceptable definitions.

### Conclusion

It does not appear either that Commerce disobeyed this court's instructions by failing to inquire into the precise nature of the competitive advantage derived from the benefit bestowed by the Government of Mexico on Florex, or that Commerce's determination that flower growers were not a discrete class of grantees was unsupported by substantial evidence and contrary to law. As to the issue of whether Commerce erroneously failed to find countervailability because it does not define "industry or industries" to encompass the entire agricultural sector of the Mexican economy, the court finds Commerce's application of the governing statute reasonable. Accordingly, the court finds that Commerce's second remand determination is based on substantial evidence and is in accordance with law. Plaintiffs' motion for judgment on the agency record is hereby denied.

---

12. Chief Judge Nies' opinion in *PPG* indicates absolute number is but one factor to be considered. *See PPG,* 928 F.2d at 1576–77. Thus, absolute number would be a dubious basis upon which to base completely a negative countervailing duty determination. If the relevant language in the *PPG* opinion does not control, *see supra,* note 3, this factor presents even greater problems.