SAUDI IRON AND STEEL COMPANY (HADEED), Plaintiff,

v.

UNITED STATES, Defendant,

Georgetown Steel Corp., et al., Defendant–Intervenors.

GEORGETOWN STEEL CORP., et al., Plaintiffs,

v.

UNITED STATES, Defendant,

Saudi Iron and Steel Company (Hadeed), Defendant–Intervenor.

Court No. 86–03–00283.

United States Court of International Trade.

May 20, 1988.

Miller & Chevalier, Chartered, Homer E. Moyer, Jr., Joanne Thomas Asbill and Christopher C. Gould, Washington, D.C., for Saudi Iron and Steel Co.

Fried, Frank, Harris, Shriver & Jacobson, David E. Birenbaum and Alan Kashdan, Washington, D.C., for Atlantic Steel Co.

Wiley, Rein & Fielding, Charles Owen Verrill, Jr., Robert C. Weissler and Alan H. Price, Washington, D.C., for Georgetown Steel Corp., North Star Steel Texas, Inc. and Raritan River Steel Co.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U. S. Dept. of Justice, Elizabeth C. Seastrum, U.S. Dept. of Commerce, Matthew Jaffe, Mary White, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

DiCARLO, Judge:

Plaintiffs brought this action to contest the findings of the United States Department of Commerce, International Trade Administration (Commerce) in *Final Af-* *firmative Countervailing Duty Determination and Countervailing Duty Order; Carbon Steel Wire Rod From Saudi Arabia*, 51 Fed.Reg. 4206 (Feb. 3, 1986). In an earlier opinion, all but one of the challenged findings were affirmed. *Saudi Iron and Steel Co. v. United States*, 11 CIT ——, 675 F.Supp. 1362 (1987). The action was remanded for Commerce to explain how the Saudi Basic Industries Corporation's (SABIC's) transfer of the Jeddah Steel Rolling Company (SULB) to the Saudi Iron and Steel Company (Hadeed) bestowed a benefit "directly or indirectly on the manufacture, production, or export" of carbon steel wire rod by Hadeed within the meaning of 19 U.S.C. § 1677(5)(B) (1982). *See* Remand Determination, *Saudi Iron and Steel Co. (Hadeed) v. United States*, 675 F.Supp. 1362 (1987) (Remand Determination).

Hadeed contests Commerce's remand determination and a related part of the final determination. The Court affirms the determination that SULB's acquisition indirectly benefitted Hadeed's wire rod production, but remands the action for reconsideration of the method used to calculate the benefit.

### Background

Hadeed began producing steel billets at its steel mill in 1983, using some of the billets at its steel rolling mill to produce carbon steel wire rod, the product under investigation. SULB produces steel reinforcing bar (rebar) at its steel rolling mill but has no facilities for producing carbon steel wire rod or the billets necessary to make its rebar.

SABIC acquired majority ownership of SULB in 1979, purchased all of SULB's stock in 1982, and transferred the stock in SULB in exchange for stock in Hadeed in late 1982. Prior to this transfer SULB used imported billets in making its rebar, but after the transfer began obtaining the billets from Hadeed.

Commerce determined this transfer was a "provision of capital ... on terms inconsistent with commercial considerations" within the meaning of 19 U.S.C. § 1677(5)(B)(i) (1982). The Court affirmed

this determination in *Saudi Iron and Steel Co.*, 11 CIT at ——, 675 F.Supp. at 1371–73.

The transfer is countervailable under § 1677(5)(B)(i) if pursuant to 19 U.S.C. § 1677(5)(B) (1982) it bestows a benefit "directly or indirectly on the manufacture, production, or export" of carbon steel wire rod. On remand to explain how acquisition of SULB, a producer of rebar, benefitted Hadeed's wire rod production, Commerce determined

> the transfer of SULB's assets to HADEED confers an indirect benefit on HADEED's production of carbon steel wire rod because the steel mill at HADEED can now sustain a higher level of capacity utilization in its production of billets, the primary raw material used to manufacture carbon steel wire rod. This higher level of capacity utilization thus affords HADEED the opportunity to reduce its production costs for carbon steel wire rod in response to market demand while maintaining a satisfactory rate of return.

Remand Determination at 2.

In support of its remand determination, Commerce presented the following analysis:

> First, when SULB became a wholly-owned subsidiary of HADEED, it also became a captured market for the purchase of HADEED's steel billets.... Second, once HADEED had an assured market for its billets, its steel mill could maintain a high level of capacity utilization because of the high demand for steel products made from billets.... Third, a high level of capacity utilization enabled HADEED's steel mill to lower the billet price charged its rolling mills and still achieve a satisfactory rate of return for its billets.... Finally, HADEED's ability to lower the billet cost for its rolling mills enabled it to better control its sale price for carbon steel wire rod and still maintain a satisfactory rate of return for its wire rod....

Remand Determination at 3.

### Discussion

In reviewing Commerce determinations in countervailing duty investigations, the Court is directed by Congress to hold unlawful those determinations found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1982). The issues before the Court are: (1) whether the determination that SULB indirectly benefited Hadeed's production of carbon steel wire rod by allowing for the reduction of production costs through increased billet production is supported by substantial evidence; and (2) whether the rate of return shortfall method used to calculate Hadeed's countervailable benefit from acquisition of SULB is in accordance with law.

(1)

■ Hadeed contends Commerce's determination, that the production of wire rod benefitted indirectly from increased billet production, is not supported by substantial evidence, asserting that each of the steps in Commerce's analysis is unsupported by substantial evidence on the record. The Court will evaluate plaintiff's individual arguments, but the issue before the Court is whether the record contains substantial evidence to support the overall determination that acquisition of SULB indirectly benefited Hadeed's production of wire rod through increased billet production. "Substantial evidence on the record means 'more than a mere scintilla' and 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 2 Fed.Cir. (T) 130, 136, 744 F.2d 1556, 1562 (1984); *see also Federal Trade Comm'n v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454, 106 S.Ct. 2009, 2015, 90 L.Ed.2d 445 (1986).

Hadeed first challenges Commerce's finding that when SULB became a wholly-owned subsidiary of Hadeed it also became a captured market for the purchase of Hadeed's steel billets, claiming that, regardless of the stock transfer, SULB was a captured market for Hadeed because SABIC owned both SULB and Hadeed before the 1982 transfer.

Commerce states that SABIC's controlling interest in Hadeed and SULB prior to the 1982 transfer "did not guarantee that SULB would be, or otherwise would remain, a customer for the purchase of Hadeed's steel billets." Remand Determination at 3. Commerce reasons that absent the 1982 transfer SABIC might have decided to otherwise dispose of its interest in SULB, and SULB might have found it more profitable to purchase billets from a source other than Hadeed. *Id.* at 4; *see also* Conf.R. 931. Commerce considers it even more likely that SULB would have been otherwise disposed of by SABIC since SABIC's charter authorizes private ownership of as much as 75% of its stock. Remand Determination at 3–4. *See also* Conf.R. 931; R. 372, 3626 (30% of SABIC's stock was sold to the public in 1984). Commerce also notes that until Hadeed acquired SULB the interests of the two companies remained adverse, in that contractually SULB would benefit from low steel billet transfer prices and assurances of supply while Hadeed would benefit from high sales prices for its billets and assurances of purchase. Remand Determination at 4, 9 n. 6; *see also* Conf.R. 1045–46.

The Court will not speculate on whether SABIC could or would have had SULB purchase steel billets from Hadeed, when any variety of factors might have influenced SABIC to do otherwise. Based on the record, the Court finds it reasonable for Commerce to conclude that SULB became a captured market for Hadeed when it became a wholly-owned subsidiary of Hadeed.

Hadeed asserts it could have maintained a high level of capacity utilization even without SULB as an assured market for its billets. Hadeed claims that SULB would have purchased billets from it in any event, because the two are closely located in Saudi Arabia. Hadeed also asserts that it could have sold all the steel billets it wished to produce even without SULB as a buyer. *See* Plaintiff's Confidential Brief on Results of Remand, 7.

As found above, Commerce could find there was no guarantee that SULB would purchase its billet requirements from Hadeed before the 1982 transfer. Although the proximity of the two companies may have reduced freight costs and their joint location in Saudi Arabia would avoid customs duties, there is no evidence in the record to show that such costs savings would have been passed on in the final price for billets or that any adjustments Hadeed might have made due to possible cost savings would have made its steel billets competitive with imported steel billets. There is also no evidence in the record which shows Hadeed could have sold all the steel billets it could produce without SULB as a buyer.

The record indicates that after the 1982 stock transfer "[a]lmost all of SULB's demand on billets is supplied from Jubail by [Hadeed]," R. 2674, and that Hadeed has been able to maintain a high level of capacity utilization. *See* R. 2658; Conf.R. 799–801, 886–87. This evidence is sufficient to support Commerce's conclusion that Hadeed's steel mill could maintain a high level of capacity utilization once it had SULB as an assured market for its billets.

Hadeed also challenges the findings that a high level of capacity utilization enabled it to lower billet costs and that such cost savings enabled it to better control its sales price for carbon steel wire rod, claiming there is no evidence in the record from which to verify the assumptions that increased billet production decreased the unit costs of billets, that such alleged cost savings were passed on to its rolling mills, or that prices for wire rod were reduced due to such cost savings.

The record does not contain numerical documentation concerning prices from which Commerce could demonstrate that increased billet production reduced billet per-unit costs. As defendant notes, no such documentation could be developed because before the 1982 transfer Hadeed did not produce billets and therefore no data on actual billet production or billet cost per-unit as of 1982 exists to compare to Hadeed's capacity utilization after acquiring SULB. Without this data, it was also impossible for Commerce to numerical-

ly demonstrate that Hadeed passes costs savings in billet production on to its rolling mills and reduces its wire rod costs because of such costs savings.

The record contains a World Bank study evaluating the Saudi Steel Project which states that "in a capital intensive project such as a steel plant, the level of capacity utilization is the most significant determinant in the cost of production and thus the profitability of such a plant." R. 1695, 1714; Conf. R. 915, 917. That study recommended that the Saudi steel project install equipment that would enable Hadeed's steel mill to produce billets for SULB in order

> to allow higher rates of capacity utilization than could be achieved with the design proposed in the feasibility study. This is an important factor in any capital-intensive project (such as a steel plant), and especially so in an isolated location such as Al Jubail, where capital and operating costs are bound to be high.

R. 1701; see also Conf. R. 906–07. The record also contains a World Bank study evaluating the Jubail Rolling Mill Project which shows that the costs of steel billets are a major percentage of the total production costs of carbon steel wire rod and that decreases in billet costs can directly increase a rolling mill's rate of return. R. 1731, 1745; Conf. R. 1006, 1041.

The Court concludes there is sufficient evidence to support Commerce's findings that a high level of capacity utilization enabled Hadeed to lower billet costs and thus "better control its sales price for carbon steel wire rod." Remand Determination at 7. The Court holds Commerce's determination that Hadeed's production of carbon steel wire rod benefitted indirectly from SULB's acquisition is supported by substantial evidence in the record.

(2)

■ Commerce found that SABIC's transfer of SULB's stock to Hadeed in exchange for Hadeed stock was on terms inconsistent with commercial considerations. In the final determination, Commerce calculated the benefit conferred on Hadeed by the stock transfer using the

"rate of return shortfall methodology." 51 Fed.Reg. at 4210. Commerce computed the rate of return shortfall by taking the difference between a national average rate of return on equity in Saudi Arabia and the rate of return on equity in Hadeed during the 1984 investigatory period. Commerce then multiplied the rate of return shortfall by the net book value of SULB's equity at the time of the 1982 transfer, and divided the result by the total value of Hadeed's and SULB's consolidated sales in 1984, arriving at an estimated net bounty or grant of 0.53 percent ad valorem. Id.

Now that Commerce has explained how SULB's acquisition benefitted Hadeed's wire rod production, Hadeed argues that use of the rate of return shortfall method is contrary to law in this case because it does not relate to the cost savings allegedly garnered from increased billet production and used to reduce wire rod production costs.

In the final determination, Commerce stated:

> Throughout this notice, we refer to certain general principles applied to the facts of the current investigation. These principles are described in the 'Subsidies Appendix' attached to the notice of 'Cold–Rolled Carbon Steel Flat–Rolled Products from Argentina; Final Affirmative Countervailing Duty Determination and Countervailing Duty Order,'....

That Subsidies Appendix states that for government equity purchases Commerce deems inconsistent with commercial considerations the benefit is measured by the rate of return shortfall method. See Subsidies Appendix, Cold–Rolled Carbon Steel Flat–Rolled Products From Argentina: Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 49 Fed.Reg. 18,006, 18,020 (Apr. 26, 1984). Commerce used the rate of return shortfall method to measure the benefit from equity infusions in investigations that followed publication of this Subsidies Appendix. See, e.g., Deformed Steel Concrete Reinforcing Bar From Peru, 50 Fed. Reg. 48,819, 48,821 (Nov. 27, 1985); Carbon Steel Wire Rod From Zimbabwe, 51

Fed.Reg. 29,292, 29,294 (Aug. 15, 1986); *Stainless Steel Plate From the United Kingdom,* 51 Fed.Reg. 44,656, 44,660 (Dec. 11, 1986). Commerce provides no explanation for the use of the rate of return shortfall method in this case other than the reliance on this Subsidies Appendix.

The court in *Ipsco, Inc. v. United States,* 12 CIT ___, 687 F.Supp. 614 (1988), considered whether a fixed rule for allocating the value of grants over time set forth in the same Subsidies Appendix could be used by Commerce without an explanation as to why the time period it provided was appropriate for that case. The court reasoned that "[a]bsent the existence of a properly promulgated rule governing [Commerce's] selection of allocation periods ... [Commerce] must explain the basis for its decision based on the facts of this case." *Ipsco,* 12 CIT at ___, 687 F.Supp. at 626 (citing *Carlisle Tire & Rubber Co. v. United States,* 10 CIT ___, 634 F.Supp. 419, 423 (1986) and the cases therein). The *Ipsco* court went on to conclude that Commerce could not apply a fixed rule set forth in the Subsidies Appendix independent of the particular facts of record.

Like the allocation method discussed in *Ipsco,* the rate of return shortfall method as set forth in this Subsidies Appendix is an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy subject to the rulemaking requirements of the Administrative Procedure Act, 5 U.S.C. § 553 (1982), rather than an interpretive rule or general statement of policy, procedure or practice excepted from those requirements. As in *Ipsco,* Commerce here has failed to provide a basis for its decision to use the rate of return shortfall method in calculating the benefit. It may be that there are no other viable alternatives for measuring the benefit plaintiff derived from acquisition of SULB, but Commerce's stated reliance on the Subsidies Appendix

indicates that none were even considered. It is too late for the purposes of this case for Commerce to promulgate a rule justifying the method it used since the new rule would not apply retroactively. *Alhambra Foundry Co. v. United States,* 12 CIT ___, 685 F.Supp. 1252, 1260–61 (1988). The action is remanded for Commerce to reconsider the benefit at issue and to explain after reconsideration its reasons for choosing the method it determines is appropriate.

## Conclusion

The determination that Hadeed's production of carbon steel wire rod benefitted indirectly from SULB's acquisition is affirmed. The action is remanded for Commerce to reconsider the method of calculating the benefit and to explain the reasons for its choice of method after reconsideration.

Commerce shall file its remand with the Court in 25 days of the date of this opinion. Hadeed will thereafter have 10 days in which to file a brief on the remand results with the Court. Defendant and the domestic producers shall file a reply within 10 days after receipt of Hadeed's brief.

So ordered.