SAUDI IRON AND STEEL COMPANY (HADEED), Plaintiff,

v.

UNITED STATES, Defendant,

Georgetown Steel Corp., et al., Defendant–Intervenors.

GEORGETOWN STEEL CORP., et al., Plaintiffs,

v.

UNITED STATES, Defendant,

Saudi Iron and Steel Company (Hadeed), Defendant–Intervenor.

Court No. 86–03–00283.

United States Court of International Trade.

Oct. 5, 1988.

Miller & Chevalier, Chartered (Homer E. Moyer, Jr., Joanne Thomas Asbill and Christopher C. Gould), Washington, D.C., for Saudi Iron and Steel Co. (HADEED).

Fried, Frank, Harris, Shriver & Jacobson (David E. Birenbaum and Alan Kashdan), Washington, D.C., for Atlantic Steel Corp.

Wiley, Rein & Fielding (Charles Owen Verrill, Jr., Robert C. Weissler and Alan H. Price), Washington, D.C., for Georgetown Steel Corp., Northstar Steel Texas, Inc. and Raritan River Steel Co.

John R. Bolton, Asst. Atty. Gen.; David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (Elizabeth C. Seastrum); U.S. Dept. of Commerce (Matthew Jaffe), Washington, D.C., for defendant.

DiCARLO, Judge.

This action is before the Court after a second remand to the International Trade Administration of the United States Department of Commerce (Commerce) in an action challenging Commerce's findings in *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Carbon Steel Wire Rod From Saudi Arabia*, 51 Fed.Reg. 4206 (Feb. 3, 1986). The Court now affirms Commerce's use of a rate of return shortfall methodology.

## BACKGROUND

Section 771(5)(B)(i) of the Tariff Act of 1930, as amended, defines a domestic subsidy, in part, as "[t]he provision of capital ... on terms inconsistent with commercial considerations." 19 U.S.C. § 1677(5)(B)(i) (1982). In its first opinion in this case, *Saudi Iron and Steel Co. (HADEED) v. United States*, 11 CIT ——, 675 F.Supp. 1362, 1371–73 (1987) (*Saudi I*), the Court found it sufficiently reasonable for Commerce to determine that the transfer of the Jeddah Steel Rolling Company (SULB) to the Saudi Iron and Steel Company (HADEED) constituted a "provision of capital ... inconsistent with commercial considerations." However, in order to be counteravailable, a subsidy must also be found to be "paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise." 19 U.S.C. § 1677(5)(B). *Saudi I* remanded for Commerce to explain how the transfer of SULB, which produced steel reinforcing bar, to HADEED, which produced billets and steel wire rod, benefitted—either directly or indirectly—HADEED's production of steel wire rod, the product under investigation.

Commerce explained that HADEED benefitted indirectly from its acquisition of SULB by illustrating how the acquisition of SULB permitted HADEED's steel mill to sustain a guaranteed high level of capacity utilization in its production of billets which, in turn, afforded HADEED a guaranteed opportunity to control internally its production costs and sale price for carbon steel wire rod. In the second opinion in this case, the Court found that substantial evidence on the administrative record supported Commerce's findings. *Saudi Iron and Steel Co. (HADEED) v. United States*, 12 CIT ——, 686 F.Supp. 914 (1988) (*Saudi II*). The Court remanded a second time, however, because Commerce had calculated the benefit conferred by using the "rate of return shortfall methodology" that was announced in the Subsidies Appendix. *Id.* at ——, 686 F.Supp. at 918. *See Subsidies Appendix, Cold–Rolled Carbon Steel Flat–Rolled Products From Argentina: Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 49 Fed.Reg. 18,006, 18,020 (Apr. 26, 1984). *Saudi II* found that Commerce's reliance on the Subsidies Appendix as a fixed rule independent of the facts of record had been disallowed in *Ipsco, Inc. v. United States*, 12 CIT ——, 687 F.Supp. 614, 626–31 (1988). Because Commerce

failed to provide a basis other than the *Subsidies Appendix* for its decision to use the rate of return shortfall methodology in calculating HADEED's benefit, the Court remanded for Commerce to reconsider the benefit and explain after reconsideration the reasons behind the methodology employed. *Saudi II*, 12 CIT at —, 686 F.Supp. at 919.

## DISCUSSION

In its second remand determination, Commerce has reconsidered the question of what methodology should be used to calculate the indirect benefit of the subsidy to HADEED and redetermined that the rate-of-return shortfall methodology is an appropriate and reasonable method for measuring the extent to which Hadeed's acquisition of SULB is inconsistent with commercial considerations. Hadeed contends that this methodology is inappropriate because it bears no relation to the reasons which Commerce gave for its finding that HADEED benefitted indirectly from the acquisition of SULB.

As the second remand determination explains, Commerce has found that an equity infusion benefits an entire company, not just certain parts of it. *Second Remand Determination* at 5–6. Commerce determined that the domestic subsidy (i.e., the acquisition of SULB) was clearly linked to the production of carbon steel wire rod. *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Carbon Steel Wire Rod from Saudi Arabia*, 51 Fed.Reg. 4206, 4209–10 (Feb. 3, 1986); *Remand Determination* at 2–9; *Second Remand Determination* at 5–7. Commerce determined after the second remand that once a firm's net capital stock is increased, the whole structure of the company changes:

> its profitability and leverage ratios change; its earnings potential changes: its prospects for attracting new investment or contracting new debt change. In effect, a new company is created.... The effect ... of HADEED's acquisition of SULB is reflected in the rate of return on equity that the "new" HADEED will

now generate. The shares acquired in exchange for SULB will earn a return based on the operation of the whole company, not just on the production of rebar [steel reinforcing bar] or wire rod. Investors receive a return on their investment only if the whole company earns a profit, not if just one product of a company earns a profit. From all points of view, equity is inextricably tied to the performance of the whole company. Therefore, *any infusion of equity, no matter what the form, must be allocated over a company's total sales.*

*Second Remand Determination* at 6–7 (emphasis added). Commerce's determination is consistent with determinations Commerce made in *Industrial Nitrocellulose from France; Final Results of Countervailing Duty Administrative Review*, 52 Fed.Reg. 833 (Jan. 9, 1987), and in *Stainless Steel Plate from the United Kingdom; Final Results of Countervailing Duty Administrative Review*, 51 Fed.Reg. 44,656 (Dec. 11, 1986).

In its first remand determination, Commerce explained how the acquisition of SULB is tied to HADEED's manufacture, production, or export of carbon steel wire rod. In its second remand determination, Commerce explained how the rate of return shortfall methodology best measures the extent to which acquisition of SULB is inconsistent with commercial considerations.

### Commerce's Rate of Return Shortfall Methodology

Where there is no market-determined price for an infusion of equity, Commerce determines whether the government infusion is inconsistent with commercial considerations by first assessing the company's prospects at the time the government equity infusions were made to determine whether the company is "equityworthy," i.e., whether it is a reasonable investment from the standpoint of a reasonable private investor. *Second Remand Determination* at 3. To be equityworthy, a company must show an ability to generate a reasonable rate of return within a reasonable period of time. *Id.* If the company is equityworthy,

Commerce concludes that the equity infusion is consistent with commercial considerations and is not a subsidy because a reasonable private investor would have invested in the company. *Id.* at 4. If the company is not equityworthy, Commerce looks at what the company would have had to "pay" for the equity infusion, absent government intervention, in order to determine whether a reasonable private investor would have invested in the company. *Id.*

Under Commerce's methodology, the measure of what a firm "pays" for equity is its rate of return on equity. *Id.* The rate of return on equity reflects the price the firm must offer to attract equity, any dividends paid, and changes in the company's retained earnings and net worth. *Id.* Commerce compares the company's rate of return with the national average rate of return on equity on the rationale that a reasonable private investor would expect investment returns to at least equal the national average rate of return. *Id.* If the firm's rate of return is equal to or greater than this national average, Commerce will not find a subsidy because the firm's rate of return would be consistent with commercial considerations. *Id.* If the firm's rate of return is below the national average, the "rate of return shortfall," Commerce finds a subsidy equal to the difference between what the firm actually paid on its equity and what an average firm in the country paid. *Id.* at 4–5. Once Commerce determines that a firm is not equityworthy and that there is a shortfall, Commerce measures the benefit by multiplying the company's rate of return shortfall by the value of the government's equity infusion. *Id.* at 5.

HADEED makes no argument in direct opposition to the methodology Commerce utilized and fails to offer an alternative to it. HADEED's only argument is that the methodology is wrong because it bears no relation to the "economies of scale" rationale upon which Commerce based (and the Court sustained) its determination that HADEED benefitted indirectly from the SULB transfer. Presumably, HADEED would calculate the subsidy as the value of economies of scale in billet production. No record data exists however concerning HA-DEED's billet production prior to 1982, since HADEED did not produce billets then. As the Court recognized in *Saudi II,* it would be impossible to calculate the indirect benefit to HADEED of SULB's transfer by attempting to calculate the "reduced billet per-unit costs … because … no data on actual billet production or billet cost per unit as of 1982 exists to compare to HA-DEED's capacity utilization after acquiring SULB." *Saudi II,* 12 CIT at ——, 686 F.Supp. at 917.

Even if Commerce could have calculated the value of the economies of scale, Commerce states that HADEED fails to recognize that the beneficial economies of scale which resulted from its acquisition of SULB do not constitute the domestic subsidy bestowed. Commerce found that the subsidy bestowed was the transfer of SULB to HADEED, and it is the degree to which this provision of capital is made on terms inconsistent with commercial considerations that is countervailable. As Commerce explained in the second remand determination, "[t]he issue of economies of sale discussed at length in our first Remand Determination merely illustrated how the acquisition of SULB affected *every aspect* of the 'new' HADEED." *Second Remand Determination* at 6 (emphasis added). Commerce determined after the second remand that its rate of return shortfall methodology is an appropriate methodology to employ because it measures the extent to which the equity infusion is allocated over the company's total sales. Commerce thus determined that the rate of return shortfall methodology was appropriate to measure HADEED's benefit from the transfer of SULB on terms inconsistent with commercial considerations.

Commerce noted that government provision of equity does not *per se* confer a subsidy. The fact that the transfer of SULB to HADEED constituted a provision of capital, or that this transfer indirectly benefited HADEED's production of carbon steel wire rod, does not by itself establish a countervailable benefit. It is the degree to which this transfer took place on terms

inconsistent with commercial considerations that make it countervailable.

## CONCLUSION

Having reviewed Commerce's second remand determination and explanation of its rate of return shortfall methodology, the Court finds that Commerce's methodology is a reasonable means of assessing the net benefit received as a result of the subsidy.

"As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology."

*RSI (India) Pvt., Ltd. v. United States,* 12 CIT ——, 687 F.Supp. 605, 614 (1988); *Ceramica Regiomontana, S.A. v. United States,* 10 CIT ——, 636 F.Supp. 961, 967 (1986), *aff'd,* 810 F.2d 1137 (Fed.Cir.1987). The Court affirms Commerce's calculation of the benefit at 0.53 percent ad valorem. The action is dismissed.