COMPANHIA SIDERURGICA
PAULISTA, S.A., et al.,
Plaintiffs,

v.

The UNITED STATES, Defendant.

Court No. 87–02–00159.

United States Court of
International Trade.

Nov. 9, 1988.

Willkie Farr & Gallagher, William H. Barringer, Arthur J. Lafave, III and Robert A. Peterson, Washington, D.C., for plaintiffs.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Platte B. Moring, III, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

RESTANI, Judge:

Plaintiffs, two Brazilian steel companies, Companhia Siderurgica Paulista S.A. (COSIPA) and Companhia Siderurgica Nacional S.A. (CSN), bring this action under section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a, contesting the final results of an administrative review of a countervailing duty order by the United

States Department of Commerce, International Trade Administration (ITA) in *Carbon Steel Products from Brazil*, 52 Fed. Reg. 829 (Jan. 9, 1987). Pursuant to Rule 56.1 of the Rules of this Court, plaintiffs move for judgment upon the agency record.

### Background

On November 10, 1983, the United States Steel Corporation (now known as the USX Corporation) filed a countervailing duty petition with ITA and the International Trade Commission (ITC), alleging that certain carbon steel products from Brazil, including hot-rolled and cold-rolled carbon steel sheet, were receiving subsidies within the meaning of § 701 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1671 (1982), and that an industry in the United States was materially injured, or threatened with material injury, by reason of such imports.

As a result, ITA initiated a subsidy investigation and on April 26, 1984 issued its final determination that certain benefits constituting subsidies within the meaning of the countervailing duty law were being provided to Brazilian manufacturers, producers or exporters of certain carbon steel products. In that determination, net subsidies of 36.48 percent and 62.18 percent were calculated for COSIPA and CSN, respectively.[1] Following ITC's finding that the subject products were materially injuring a United States industry, ITA published its countervailing duty order on June 22, 1984, directing customs to collect cash deposits of estimated countervailing duties. *Carbon Steel Products from Brazil*, 49 Fed.Reg. 25,655.

On September 6, 1985, ITA revoked the countervailing duty order with retroactive effect to October 1, 1984. *Carbon Steel Products from Brazil*, (Final Results of Changed Circumstances Administrative Review and Revocation of Countervailing Duty Order), 50 Fed.Reg. 36,460. The revocation resulted in part from the entry into force of a Voluntary Restraint Agreement

between the United States and Brazil which imposed quotas on exports of certain Brazilian steel products including the subject merchandise.

With respect to merchandise subject to the countervailing duty order that entered the United States on or after February 10, 1984, the date of ITA's preliminary affirmative determination, and before October 1, 1984, the effective date of the revocation of the countervailing duty order, ITA announced its intention to conduct an administrative review, if requested to do so. *Id.* at 36,461.

On September 30, 1985, the Government of Brazil and three importers requested such an administrative review. The administrative review was initiated on November 27, 1985 with plaintiffs, COSIPA and CSN participating as respondents. 50 Fed.Reg. 48,825. ITA published the preliminary determination in the administrative review on October 31, 1986. *Carbon Steel Products from Brazil*, 51 Fed.Reg. 39,774. In the preliminary determination, ITA found that equity investments in COSIPA and CSN made by the Brazilian government between 1977 and 1984 were "on terms inconsistent with commercial considerations" and therefore countervailable subsidies. *Id.* at 39,776.

ITA issued its final determination in the administrative review on January 9, 1987, reaffirming its preliminary findings on all issues, including the alleged equity subsidies provided to COSIPA and CSN. The value of the overall net subsidies was determined to be 9.14 percent *ad valorem* for COSIPA and 39.98 percent *ad valorem* for CSN.[2] *Carbon Steel Products from Brazil*, 52 Fed.Reg. 829.

The equity infusions at issue in this case were intended to finance the third stage (Stage III) of a three-stage expansion program which each of the plaintiff companies was carrying out simultaneously. Plans to expand Brazil's steel industry were initially

---

1. A net subsidy rate of 17.49 percent was calculated for a third Brazilian company, Usinas Siderurgicas de Minas Gerais, S.A. (USIMINAS). 49 Fed.Reg. at 17,988.

2. Maxitrade, a trading company, was found to receive a net subsidy valued at 38.45 percent *ad valorem*.

formulated in the late 1960's after a study commissioned by the Brazilian government concluded that the comparative advantage Brazil had in producing steel (namely, its abundant resources of high grade iron ore and relatively inexpensive labor force), coupled with the prospective growth of domestic demand, justified a substantial expansion of the country's steel-making capacity. The study further concluded that the best strategy to bring about such an expansion was to expand the country's large integrated mills rather than establish a new integrated plant.

In accordance with these suggestions, and in cooperation with the World Bank, COSIPA and CSN (as well as USIMINAS) began to expand capacity in the late 1960's. By the late 1970's, Stages I and II of the coordinated expansion program were completed, substantially increasing the raw steel production capacity of both firms. The third stage of the expansion program was approved in 1975 by the World Bank and other sources of non-Brazilian financing and was originally intended to be completed by 1979.

### Arguments

Plaintiffs make three basic arguments: (1) that ITA's determinations that COSIPA and CSN were not equityworthy between 1977 and 1984 and that the Government of Brazil did not expect a reasonable rate of return on its investment in those companies during this period were not supported by substantial evidence in the record; (2) that the benchmark rate of return used to measure any equity subsidy found, should be the average rate of return for the steel industry, not a national average rate of return; (3) that ITA erroneously calculated the benefit to certain trading companies which were also covered by the review.

**3.** Addressing the question of when government funds are provided to a company under conditions inconsistent with commercial considerations, the Subcommittee on Trade of the House Committee on Ways and Means observed in its "Summary of Recommendations for Legislation Implementing the Multilateral Trade Negotiations," 96th Cong., 1st Sess. 4 (Comm. Print 21 (1979)):

### Discussion

### I. Equityworthiness of COSIPA and CSN

Under section 701 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1671 (1982 & Supp. IV 1986) (the Act) ITA is required to determine whether foreign manufacturers or exporters are receiving subsidies from foreign governments or other foreign entities with respect to merchandise imported into the United States. If ITA's determination is affirmative and the International Trade Commission determines that imports of the subsidized merchandise are materially injuring an industry in the United States, countervailing duties equal to the net amount of the subsidies must be imposed upon the subsidized goods entering the United States.

Section 771(5) of the Act, as amended, defines subsidy to include "[t]he provision of capital, loans, or loan guarantees *on terms inconsistent with commercial considerations.*" 19 U.S.C. § 1677(5)(B)(i) (1982) (emphasis added). Although the statute does not define the phrase "inconsistent with commercial considerations," both the legislative history of the Trade Agreements Act of 1979 and subsequent decisions of this court make clear that "an investment is to be considered consistent with commercial considerations if a reasonable investor could expect a reasonable rate of return on his investment within a reasonable period of time." *British Steel Corp. v. United States*, 10 CIT 224, 226, 632 F.Supp. 59, 61 (1986) (citing *British Steel Corp. v. United States*, 9 CIT 85, 605 F.Supp. 286, 293 (1985)).[3]

Thus, under the "commercial considerations" test, ITA attempts to analyze the investment of equity capital from the standpoint of a reasonable private investor. According to the methodology set forth in

With regard to the provision of capital, "commercial considerations" shall mean consideration of whether at the time the capital is provided, the recipient is required, and can be expected within a reasonable period of time, to derive from its operations a reasonable rate of return on its invested capital.

ITA's Subsidies Appendix,[4] the agency prefers to analyze the investment by reference to the market price of shares in the investigated company. "If the government buys shares directly from the company [either a new issue or corporate treasury stock], and similar shares are traded in a market, a subsidy arise[s] if the government pays more than the prevailing market price." Subsidies Appendix, 49 Fed.Reg. at 18,020. When there is no market price for the shares (as where, for example, the government is the owner of the company) ITA determines whether the equity infusion is inconsistent with commercial considerations by "assessing the company's prospects at the time the equity infusions were made to determine whether the company is 'equityworthy', i.e. whether it is a reasonable investment from the perspective of a reasonable private investor." *Saudi Iron and Steel Co. v. United States*, 12 CIT ——, 698 F.Supp. 912, 914 (1988). In making this determination, ITA considers a wide range of indicators which are set forth in the Subsidies Appendix:

> To be "equityworthy," a company must show ability to generate a reasonable rate of return within a reasonable period of time. In making our equityworthiness determinations, we assess the company's current and past financial health, as reflected in various financial indicators taken from its financial statements, and, where appropriate, internal accounts. We give great weight to the company's recent rate of return on equity as an indication of financial health and prospects. Like our creditworthiness tests, our equityworthiness analysis also takes into account the company's prospects, as reflected in market studies, country and industry forecasts, and

project and loan appraisals, when these types of analyses are available.

Subsidies Appendix, 49 Fed.Reg. at 18,020.

In making its determination that COSIPA and CSN were not equityworthy in this case, ITA found that by the time Stage III construction began in the late 1970's, "the investment climate had deteriorated, international markets for steel began to decline, and public sector investment dried up." 52 Fed.Reg. at 832. Acknowledging that Stage III may still have yielded positive financial returns despite the financial and economic conditions at the time, ITA focused its analysis on the overall operational and financial performance of the producers. The results of this analysis are set forth in the final determination:

> In the late 1970s and early 1980s, the Brazilian steel industry was characterized by Stage III construction delays, marginal or negative earnings, and a mounting economic and financial crisis. The lack of funding in the industry became critical. (The Brazilian government had a history of underfunding steel expansion projects.) By 1982, the three companies would have required 3 billion dollars in equity to correct their financial positions. Although it is now clear that the companies were severely undercapitalized, we cannot base our equityworthiness decision on what the financial standing of the companies might have been if this were not the case.

> The three companies had a uniform response to the conditions in the late 1970s: they contracted variable-rate debt at a time of high real interest rates, and they used increasing amounts of short-term debt. Not only were the companies undercapitalized, but they mismatched long-term assets with expensive short-term debt.

> During this time, an investor would have found that the steel companies were

**4.** In 1984, ITA published the "Subsidies Appendix" in conjunction with its final affirmative countervailing duty determination in *Cold-Rolled Carbon Steel Flat-Rolled Products from Argentina*, 49 Fed.Reg. 18,006, 18,016 (April 26, 1984). ITA has characterized the Subsidies Appendix as "a detailed explanation of the current countervailing duty methodology we use to examine grants, loans, loan guarantees, and equity." Subsidies Appendix, 49 Fed.Reg. at 18,016. Its primary purpose is to "clarify issues concerning the calculation of the gross subsidy" given the lack of clear legislative guidance on this subject in the Trade Agreements Act of 1979. *Id.*

incapable of covering the additional debt expense with internally generated funds. The steel companies had a low probability of increasing earnings over the short- and medium-term from domestic sales because of the squeeze between supplier price increases and the government's policy of steel price suppression. Further, it became increasingly evident that there was a long-term decline in the world-wide demand for steel, continuing the depression of steel prices in the international market.

A project such as Stage III can have future positive returns only if the company does not become insolvent. In this case, the continuation of Stage III severely jeopardized the companies' financial standing. Even if we disregard profit margins and asset turnover, we cannot disregard the adverse effects of increased financial leverage on the companies's equity standing. The additional risk in the three highly leveraged companies would have dissuaded any private investor from purchasing equity in these Brazilian steel firms during the periods we consider them not to be equityworthy. *Id.* at 833.

Plaintiffs challenge ITA's findings, basing their belief that COSIPA and CSN were equityworthy and that the government of Brazil expected a reasonable rate of return on investments made in those companies on a number of factors.

█ Central to plaintiffs' argument is their belief that ITA's reliance on "short-term static financial ratios and overall operating performance is an insufficient measure of long run investment potential and future company performance." 52 Fed.

Reg. at 832 (comment 18). Plaintiffs argue that the agency should have placed greater emphasis on certain long-range studies in the record which predicted rises in demand and shortages of supply for the international steel industry in the 1980's and 1990's.[5] The court disagrees. As ITA stated in its determination:

In contemplating an equity purchase, an investor will evaluate past and present company performance, anticipated future economic conditions and overall investment climate. Important determinants include the financial stability of the company (e.g., asset structure, funding sources, and risk of insolvency), past earnings, and the amount of financial leverage in the company's capital structure.

*Id.* at 832.

While long-range market studies and predictions are important elements of investment strategy, it is not reasonable to conclude that they alone should be the determinative, or even decisive, elements of that strategy. An investment decision based only upon anticipated returns ten to twenty years down the line is highly speculative at best. ITA properly utilized a more comprehensive analysis, which focuses on a company's current health and past performance as well as independent studies and forecasts for the industry in general.[6]

In any event, even if the court were to conclude that these long-range studies could justify an investment in the Brazilian steel industry, despite the adverse data relied on by ITA, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by

5. The court rejects defendant's counsel's argument that ITA need not consider secret reports not available to private investors. It is the reasonableness of governmental entity conduct which is at issue. In any case, ITA did not express the view that it could not consider such reports, rather it seems to have considered them and given them little weight due to changed circumstances.

6. Plaintiffs also argue that ITA failed to recognize the importance of Brazil's position as a global least-cost steel producer to the decisions to invest in COSIPA and CSN. While the 1975

World Bank studies envisioned low-cost production facilities as central to the success of the Stage III project, by the time construction began in the late 1970's costs for both companies had increased considerably due to such factors as increasing raw material costs, construction delays, declines in productivity and higher interest rates. Confidential Document Number (CR) 1004 at 5; CR 1006 at 5. As defendant notes, "plaintiffs ignore the effects of these problems upon the low-cost assumptions made in 1975." Defendant's Brief at 46.

substantial evidence." *Matsushita Electric Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984) (quoting *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); *Armstrong Bros. Tool Co. v. United States*, 626 F.2d 168, 170 n. 3, 67 C.C.P.A. 94 (1980)). The determinative factor is whether ITA, based on all of the evidence of record, could properly come to the conclusion that the investment was not one which a reasonable investor would make.

■ Plaintiffs next argue that ITA's analysis is flawed because it fails to distinguish the operating performance and the financial performance of the companies thereby allowing the financial pressures exerted by the long-term expansion programs to obscure the fundamental strength of the companies. Citing the report of an independent financial consultant, plaintiffs suggest that if ITA is to rely on short-term indicators and financial ratios, it should adjust those indicators and ratios to account for assets under construction and that portion of short-term and long-term debt associated with the expansion. Plaintiffs' Brief at 59 (citing the Report of George J. Konomos dated November 11, 1986, Confidential Document Number (CR) 10 at Ex. 17).

In its final determination, ITA correctly recognized the fallacy in plaintiffs' argument when it stated that "[f]rom an investor's point of view, there is no relevant distinction between financial and operating results." 52 Fed.Reg. at 833. ITA further explained the importance of considering a company's financial performance:

> Evaluation on the basis of current operating results (profit margin and asset turnover), without considering non-operational assets and accompanying liabilities, may be an appropriate approach for analyzing profit centers within a company. An investor, however, is concerned with the company's overall performance. To do otherwise, an investor would be ignoring the effects of the Stage III expansion program on the company. Non-performing assets not only drag down overall operating performance, but the chance that they might never come on-stream creates additional uncertainty for future earnings and therefore increases the risk of the investment.

*Id.* at 833.

In a related argument, plaintiffs contend that the very fact that the companies were undercapitalized made government equity investment commercially reasonable. Referring to an independent financial report which indicated that the major weakness of each company was "*too little* equity in proportion to debt," plaintiffs argue that "[i]f expert financial analysis indicates that COSIPA and CSN could have profitably absorbed very large amounts of equity, then it is contrary to law for [ITA] to determine that a series of smaller, cumulative equity infusions constitutes a subsidy." Plaintiffs' Brief at 76.

■ The court rejects this argument. The fact that a company is undercapitalized does not necessarily make an investment in that company commercially reasonable. The fact that a company is undercapitalized ordinarily makes that company a greater investment risk. As defendant notes, "[a]s a consequence of inadequate capitalization, a firm must increase its debt portfolio in order to finance its operations. Too little equity means that a company is highly leveraged, *i.e.*, it relies much more heavily on debt than equity to finance its operations." Defendant's Brief at 41–42. Thus, an undercapitalized company may be less attractive to the reasonable investor due to the risk of insolvency. In any case, undercapitalization is not a determinative factor by itself.

Plaintiffs finally contend that ITA's equityworthiness determination is flawed because the performance of COSIPA and CSN in the years 1981–1983 was affected by a series of events that could not reasonably have been foreseen by a prospective investor, namely: (1) "a debt crises of gargantuan proportions" (2) "the austerity program implemented by the Government in response to the debt crisis [which] led to further contraction of the Brazilian economy" and (3) "a 'maxi-devaluation' which resulted in overnight paper losses of hun-

dreds of millions of dollars by companies carrying foreign currency debt." Plaintiffs' Brief at 66–67. Plaintiffs maintain that these events were unforeseeable, unique and unlikely of repetition and, therefore, irrelevant to the question of whether the decision to invest was commercially reasonable. Plaintiffs ask the court to remand this action to ITA with instructions to eliminate these events from its analysis. Plaintiffs' Brief at 64–68.

■ While plaintiffs correctly note that investors attach less significance to economic events which are truly unique and transient, this was not the case with the events referred to by plaintiffs. Instead, the economic events of the early 1980's reflected serious weaknesses in the Brazilian economy that have more than short-term effects and that seriously affected the financial health of companies operating in that economy. These events certainly would have been of concern to a reasonable investor. As defendant correctly observes, "[t]o argue, as plaintiffs do, that the worst recession since World War II, a severe government austerity program, and a continuing debt crisis had no effect upon investor expectations is equivalent to asserting that the unforeseeable and unique crash of the stock market in 1929 would not have altered United States investors' expectations at that time." Defendant's Brief at 38. Plaintiffs' argument is without merit.[7]

## II. ITA's Calculation of the Subsidy Benefit

■ Having determined that the Brazilian government's equity infusions were inconsistent with commercial considerations, therefore constituting a countervailable subsidy, ITA then measured the benefit of the subsidy utilizing the "rate of return shortfall method." Under ITA's rate of return shortfall methodology, which was first set forth in the Subsidies Appendix, *see supra,* note 4, the agency measures the benefit of the subsidy "by multiplying the difference between the company's rate of return on equity and the national average rate (the 'rate of return shortfall') for the review period by the total amount of equity purchases made in years in which the company was unequityworthy." Subsidies Appendix, 49 Fed.Reg. at 18,020.

In this case, ITA calculated the benefit of the subsidy by comparing the companies' rates of return with the national average rate of return on equity in Brazil for 1984, as reported in *Business Latin America* (November 6, 1985). 51 Fed.Reg. at 39,776. *See also* CR 7 at 6. It found that "the rates of return for these producers were lower than the national average rates in 1984." 51 Fed.Reg. at 39,776. This "rate of return shortfall" was then multiplied by all purchases of equity (back to 1977) that ITA found to be inconsistent with commercial considerations.

Plaintiffs argue that ITA erred when it compared the rates of return for the investigated firms with the national average rate of return, and that the agency should have instead used the average rate of return for the steel industry as the benchmark rate for comparison purposes. According to plaintiffs, during 1984 the steel industry in Brazil earned an average rate of return of 1.1% on equity, a rate which yields a lower subsidy value than the national average rate of return used by ITA. Plaintiffs' Brief at 83.[8]

---

**7.** The court also finds no basis for plaintiffs' claim that in considering these events, ITA has impermissibly based its determination on hindsight. While the economic events of the 1981–83 period did affect the "results ultimately achieved in those years," they would have also affected the expectations of reasonable investors during the period. As indicated, the equity infusions and investment decisions at issue in this case were made by the Brazilian government throughout the 1977–1984 period.

**8.** It should be noted that plaintiffs here do not appear to be challenging ITA's use of "rate of return shortfall methodology" generally, but only the reasonableness of the way in which it was applied in this case. *Cf. Saudi Iron and Steel Co. v. United States,* 12 CIT ——, 686 F.Supp. 914 (1988) (finding reliance on the Subsidies Appendix an insufficient basis for applying "rate of return shortfall methodology" in the absence of further explanation based on the facts of the case, after plaintiffs challenged use of the methodology generally.) *See also Saudi Iron and Steel Co. v. United States,* 12 CIT ——, 698 F.Supp. 912 (1988) (affirming remand results).

Plaintiffs have failed to persuade the court that use of the industry-specific rate would yield a more accurate measurement of the subsidy conferred. Instead use of this rate would seem to lead to absurd results. As indicated, the industry-specific rate of return on equity in this case was apparently very low. It is not unreasonable to assume that the economic factors which contributed to this low rate of return were the very same factors which contributed to ITA's findings that the industry was not equityworthy. Thus, plaintiffs, in effect, ask the court to conclude that because steel was such a poor investment during the period, the rate of subsidization, and corresponding duties should be lower. Such a conclusion is not logical and is completely at odds with the purpose of the countervailing duty laws.

Furthermore, a national average rate of return which reflects varying rates of return and levels of risk across the whole economy would seem to provide a better benchmark against which to compare the rate of return and risk of a particular investment. A reasonable investor will not limit investment options to a particular industry but will consider a wide variety of investment options when deciding where to most effectively invest money. An industry-specific analysis which does not account in some manner for this variety of options does not yield a more accurate measurement of the subsidy conferred.

III. Benefits to Trading Companies

Finally, plaintiffs contend that ITA erred in its calculation of benefits conferred on certain trading companies. Plaintiffs'

counsel explained at oral argument that if the court remands this action to ITA with instructions to recalculate subsidy rates, the newly calculated rates could be so close as to warrant use of a countrywide rate. *See* 19 U.S.C. § 1671e(a)(2) (Supp. IV 1986) and 19 C.F.R. § 355.33(f) (1987). As indicated, company specific rates were calculated for both COSIPA and CSN in the determination under review. It is apparently plaintiffs' belief that the rates established for the trading companies might skew the countrywide rate, which might be calculated on remand, to their detriment. Because the court affirms ITA's equityworthiness determination and its method for calculating benefits in this case, it would appear, based on statements at oral argument, that the court need not reach issues regarding the calculation of subsidy rates for the trading companies.

As all issues regarding the trading companies were not fully briefed, the court will permit the parties to address whether these issues are indeed moot for purposes of this aspect of the case or are otherwise not suitable for decision at this time. Plaintiffs shall file their statement on this point within ten days of this determination. If plaintiffs assert that the trading company issues must be addressed, defendant shall respond in ten days, plaintiffs may reply within five days.